Carlos FRANK, Appellant,

v.

STATE of Alaska, Appellee.

No. 3689.

Supreme Court of Alaska.

Dec. 21, 1979.

R. Collin Middleton, Robert H. Wagstaff, Wagstaff & Middleton, Anchorage, for appellant.

Geoffrey Haynes, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

In October of 1975, Delnor Charlie, a young man from Minto, died. Immediately preparations were made for a ritual that had been performed countless times in Minto and other Central Alaska Athabascan villages. It is called the funeral potlatch, a ceremony of several days' duration culminating in a feast, eaten after burial of the deceased, which is shared by members of the village and others who come from sometimes distant locations.

Delnor Charlie's burial, as is traditional, was delayed until friends and relatives living elsewhere could reach Minto and until the foods necessary for the potlatch could be prepared. With the food preparation under way, Carlos Frank and twenty-five to thirty other men from the village formed several hunting parties for the purpose of taking a moose. It was their belief that there was insufficient moose meat available for a proper potlatch. One cow moose was shot, which Frank assisted in transporting to Minto. Some 200 to 250 people attended the final feast.

A passerby took note of one of the hunting parties and reported it to state officials, who investigated and subsequently charged Frank with unlawful transportation of game illegally taken, in violation of 5 AAC 81.140(b).[1] The season for moose hunting was closed and in any event there was no open season for cow moose in 1975. 5 AAC § 81.320 (Register 54 at 5–136, July 1975).

In the district court Frank admitted transporting the moose. He raised the defense that application of the game regulation to him, under the circumstances, amounted to an abridgment of his freedom of religion. After an extensive evidentiary hearing, Judge Clayton found that "the funeral potlatch is an·integral part of the cultural religious belief of the central Alaska Athabascan Indian." He found further "that moose is an integral part of the diet and 'the staff of life' to these Athabascan Indians;" that the food for such a potlatch "is primarily required to be native food;" that moose is "more desirable" for such a celebration than any other native food; but that it is not "specifically required for this ceremonial occasion however desirable it may be." Judge Clayton thus concluded that Frank had not been denied his religious privileges. Frank was thereupon convicted and sentenced to a forty-five day jail term with thirty days suspended, a $500 fine with $250 suspended, one year probation, and a suspension of his hunting license for one year. Judge Clayton noted at sentencing that Frank was sincere in his beliefs and it was these beliefs which had carried him into a criminal violation.

On appeal Superior Court Judge Van Hoomissen also determined "that the potlatch is an activity rooted in religious belief and a very integral part of the religious

---

1. 5 AAC 81.140(b) states:
 No person may possess or transport any game or parts of game illegally taken.

tenets of the Athabascan Indian. . . . The sincerity of the natives of Minto in their religious beliefs is not doubted." However, he agreed with Judge Clayton that fresh moose meat was not such an "absolute necessity . . . as to override the compelling state interest of the State of Alaska in the management and control of its game for the benefit of all its people, native and white," and affirmed the conviction.

We have concluded that the free exercise clauses of the first amendment to the United States Constitution,[2] and article I, section 4 of the Alaska Constitution,[3] protect Frank's conduct and that the state has not demonstrated reasons which justify prohibiting it. We therefore reverse the conviction. Our reasons follow.

## I

No value has a higher place in our constitutional system of government than that of religious freedom. The freedom to believe is protected absolutely. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218 (1940). The freedom to act on one's religious beliefs is also protected, but such protection may be overcome by compelling state interests. *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 972 (1963).[4] A law imposing criminal or other penalties on the performance of acts which conscience compels, pressures the underlying beliefs and infringes to that extent the freedom to believe. As one commentator has stated:

> The violation of a man's religion or conscience often works an exceptional harm to him which, unless justified by the most

stringent social needs, constitutes a moral wrong in and of itself, far more than would the impairment of his freedoms of speech, press or assembly. The argument is not merely that avoiding compulsion of a man's conscience produces the greatest good for the greatest number, but that such compulsion is itself unfair to the individual concerned. The moral condemnation implicit in the threat of criminal sanctions is likely to be very painful to one motivated by belief. Furthermore, the cost to a principled individual of failing to do his moral duty is generally severe, in terms of supernatural sanction or the loss of moral self-respect. In the face of these costs, the individual's refusal to obey the law may be inevitable, and therefore in some perhaps unusual sense of the word, involuntary.

J. Clark, *Guidelines for the Free Exercise Clause*, 83 Harv.L.Rev. 327, 337 (1969). Because of the close relationship between conduct and belief and because of the high value we assign to religious beliefs, religiously impelled actions can be forbidden only where they pose "some substantial threat to public safety, peace or order," *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963), or where there are competing governmental interests that are "of the highest order and . . . [are] not otherwise served . . ." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).

It has been clear at least since *Sherbert v. Verner* that in certain cases the free exercise clause requires government to accommodate religious practices by creating exemptions from general laws. Sherbert was

2. U.S.Const. amend. I states in part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

3. Art. I, § 4 states:

> No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof.

4. Mr. Justice Brennan has recently questioned whether a sharp distinction can be made between religious beliefs and practices, quoting

from Oliver Cromwell's directive regarding religious liberty for Catholics in Ireland:

> As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted.

*McDaniel v. Paty*, 435 U.S. 618, 631 n. 2, 98 S.Ct. 1322, 1330 n. 2, 55 L.Ed.2d 593, 604 n. 2 (1978) (concurring opinion) (citation omitted). See also L. Tribe, American Constitutional Law 79 80 (Supp.1979).

fired because she would not work on Saturday, the sabbath of her religion. Her claim for unemployment compensation was denied in the state courts because there was a condition of eligibility that a worker be available for work Monday through Saturday. The Supreme Court held that the state had a duty to make an exception to this policy so that Sherbert's exercise of her religion would not be penalized. 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 971.

*Sherbert* was followed in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In *Yoder* there was involved a conflict between respondents' belief, rooted in the religion of the old order Amish, that children should not attend public school beyond the eighth grade, and a Wisconsin statute requiring all children to attend public schools through the age of sixteen. The court held that an exemption must be granted. *Id.* at 236, 92 S.Ct. at 1543, 32 L.Ed.2d at 37. Other courts, following *Sherbert*, have also required exceptions to facially neutral laws in order to protect religiously based conduct.[5]

### II

■ The free exercise clause may be invoked only where there is a religion involved, only where the conduct in question is religiously based, and only where the claimant is sincere. *Wisconsin v. Yoder*, 406 U.S. 205, 215, 216, 92 S.Ct. 1526, 1533–1534, 32 L.Ed.2d 15, 25 (1972). These requirements are readily present here. We shall examine them in order.

The appellant presented impressive evidence concerning the religion of the Central Alaskan Athabascan people. Several Athabascans and expert anthropologists testified and anthropological works were received in evidence. The evidence was unrefuted, and in summary it shows the following.

Athabascan culture is highly individualized. From a complex belief system individual selection is tolerated and is the norm. Yet, there is a distinct belief system recognizable in Athabascan villages many miles apart. These beliefs have blended comfortably with Christianity which was introduced in the 19th century.

Death is the life crisis receiving the greatest attention in current Athabascan culture. While it may be awaited with equanimity, it is an event of predominant significance, whose repercussions are long felt in the village.

The funeral potlatch is the most important institution in Athabascan life. It is mandatory. Peter John, seventy-six, a former tribal chief in Minto, could not remember a death that was not followed by a funeral potlatch. It is apparently an obscenity to suggest that possibility. While a potlatch may be held to celebrate secular occasions, the funeral potlatch is distinguished by its fundamentally sacred aspect. The ritual has its origins in antiquity and it has not changed in any important respect since anthropologists first began to describe it.

Food is the cornerstone of the ritual. From the moment the death is learned of, food preparation begins. People begin to

---

5. *See, e. g., In re Jenison*, 375 U.S. 14, 84 S.Ct. 63, 11 L.Ed.2d 39 (*per curiam*) (state court decision vacated and remanded in light of *Sherbert*), *on remand*, 267 Minn. 136, 125 N.W.2d 588 (Minn.1963) (exemption from jury duty required to accommodate religious belief); *Native Amer. Ch. of New York v. United States*, 468 F.Supp. 1247 (S.D.N.Y.1979) (exemption for religious use of peyote available to any bona fide religious organization); *Michaelson ex rel. Lewis v. Booth*, 437 F.Supp. 439 (D.R.I. 1977) (municipal election may not be held on religious holy day); *Stevens v. Berger*, 428 F.Supp. 896 (E.D.N.Y.1977) (religious believers exempted from requirement of obtaining social security numbers for their children); *Geller v. Sec'y of Defense*, 423 F.Supp. 16 (D.D.C.1976) (Jewish chaplain must be permitted to wear beard); *People v. Woody*, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964) (exempting Navajo sect's use of peyote from criminal drug laws). In addition, numerous courts have found various prison regulations unnecessarily restrictive on prisoners' religious beliefs regarding: diet, *see, e. g., Kahane v. Carlson*, 527 F.2d 492 (2nd Cir. 1975); *Chapman v. Kleindienst*, 507 F.2d 1246 (7th Cir. 1974); observance of holy days, *see X v. Brierley*, 457 F.Supp. 350 (E.D.Pa.1978); and hair, *see, e. g., Teterud v. Burns*, 522 F.2d 357 (8th Cir. 1975) (native American's braids); *Wright v. Raines*, 457 F.Supp. 1082 (D.Kan.1978) (beard).

arrive in the village from nearby and remote places. Food is brought by all participants to one or several houses associated with the deceased and is shared in several pre-burial meals. The body will not be buried until a sufficient quantity of the proper food is prepared for the post burial feast. In the case of Delnor Charlie this took four to five days.

Athabascans believe that the funeral potlatch is the last meal shared by the living with the deceased. It is a communion meal. The deceased is discussed and songs of eulogy are sung. The deceased is thought to partake of the meal and this helps his spirit on its journey.[6]

The funeral potlatch serves other functions. The grief of the family is to be eased. The community becomes involved and the sharing of food is the communal tie. Prayers are said for the dead and the living. All who have come and contributed are thanked. It is hoped that the funeral potlatch and one that is to follow, often more than a year later, the memorial potlatch, will assuage the spirits and prevent future deaths.

From the foregoing it is clear, and consistent with the findings of the courts below, that the funeral potlatch is a religious ceremony. The role of moose meat in that ceremony must next be examined.

Native foods comprise almost all of the foods served at the funeral potlatch. In a culture without many formal rules this is an absolute requirement. Native food means moose, bear, caribou, porcupine, fish, duck and berry dishes.

Of the native foods moose is at the apex. The most common big game animal is required, and in Central Alaska this is moose. As the district court found, it is the staff of life; it is the meat which the people regard as most important for their sustenance. However, the district court found that although the evidence indicated that moose is

the most desirable of foods to be served, it is not "an essential requirement."

The district court's finding that moose was not essential for a funeral potlatch is based primarily on the following testimony of Chief Peter John:

Q. Could there be a potlatch without wild meat?

A. Well, it could be, maybe, but then I don't think I'll enjoy it.

However, John also stated that he had been to hundreds of potlatches and had never attended one in which there was no moose meat, a recollection shared by Catherine Attla, fifty-two, and Carlos Frank. Barbara Lane, an anthropologist, provided this gloss on John's statements:

A. If a Roman Catholic priest were in some bush area up here and found himself without the proper wafers and wine, he could still perform his function with some substitute, but it wouldn't do in the sense—If at all possible to have the proper foods, that's what you would use.

Q. But nevertheless it could be accomplished?

A. I believe so. As a dire strait, in some unusual circumstance.

Other witnesses stated that moose meat is a necessary requirement having the sacramental equivalent to the wine and wafer in Christianity. Frank and all of the Athabascan witnesses, including Peter John, testified that they could not risk showing disrespect to the dead by failing to provide moose for the post burial ritual.

 Thus we would be inclined to hold that the district court was clearly erroneous in concluding that moose meat was not essential for the observance of a funeral potlatch. However, absolute necessity is a standard stricter than that which the law imposes. It is sufficient that the practice be deeply rooted in religious belief to bring

---

6. As the district court found:

No sharp line of demarcation separates the living from the dead. It is believed that the kunkubidza ("similar to dead but still the same") of the person who died is present at

the funeral potlatch where he partakes of the communal feast by food which is burned and where he is honored by those who knew him and help him on his journey to yoyeet ("like up in the sky").

it within the ambit of the free exercise clause and place on the state its burden of justification. The determination of religious orthodoxy is not the business of a secular court. *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir. 1975); *Moskowitz v. Wilkinson*, 432 F.Supp. 947, 949–50 (D.Conn. 1977); *Geller v. Secretary of Defense*, 423 F.Supp. 16, 17 (D.D.C.1976); *Monroe v. Bombard*, 422 F.Supp. 211, 215 n. 4 (S.D.N.Y.1976).

■ We think the evidence is inescapable that the utilization of moose meat at a funeral potlatch is a practice deeply rooted in the Athabascan religion. While moose itself is not sacred, it is needed for proper observance of a sacred ritual which must take place soon after death occurs.[7] Moose is the centerpiece of the most important ritual in Athabascan life and is the equivalent of sacred symbols in other religions.[8]

The question of sincerity requires no extended discussion. The district court found Frank to be sincere in his beliefs. That conclusion is abundantly supported in the record.

## III

Having established that protected religious conduct is involved, we turn next to an evaluation of the competing state interest. There can be no question but that there is a very strong state interest underlying hunting restrictions. The game resources of Alaska occupy a place in the lifestyle of Alaskans which is unparalleled elsewhere in the United States. Rural Alaska natives are acutely aware of this. As we noted in *State v. Tanana Valley Sportsmen's Association* :

> For hundreds of years, many of the Native people of Alaska depended on hunting to obtain the necessities of life. To this day, despite incursions of those of different cultures, many Alaska Eskimos, Indians and Aleuts, eke out a livelihood by reliance on fish and game. . . .
> Not only is the game of prime importance in furnishing the bare necessities of life, but subsistence hunting is at the core of the cultural tradition of many of these people. It has been claimed that their very lifestyle is threatened if they are deprived of this traditional method of obtaining the wherewithal for existence.

583 P.2d 854, 859 n. 18 (Alaska 1978) (citations omitted). Illustrative of the importance of wildlife in Alaska is the fact that our state constitution contains specific requirements governing its use and management. *See* Alaska Constitution, article VIII, sections 2, 3 and 4.

It is not enough, however, simply to conclude that there is a compelling state interest in maintaining a healthy moose population. The question is whether that interest, or any other, will suffer if an exemption is granted to accommodate the religious practice at issue.[9] Thus, in *Wisconsin v. Yoder*,

---

7. Of course the need to take a moose out of season arises because deaths in a village may take place at any time of year and it is not part of Athabascan culture to plan for them. By contrast, the timing of the memorial potlatch, which follows the funeral potlatch often by more than a year, is controllable and it does not give rise to the same exigency as the funeral potlatch.

8. Our dissenting colleague has suggested that there was moose meat enough in the village to fulfill a symbolic role. The arresting officer, upon his arrival in Minto, did note some old, somewhat dried out, moose meat hanging outdoors, but there was no evidence that this was owned by someone who would make it available for use in the potlatch. In addition, there was evidence that there was a piece of moose meat which was served at one of the pre-burial

meals. However, except for the moose which Frank transported, there was no moose meat available for the final feast. The only witnesses who spoke to this subject stated that there was not enough moose meat available for a proper potlatch. On this record it would be clearly inappropriate for us to take a contrary view.

9. Congress' recent enactment of 42 U.S.C.A. § 1996 (Supp.1979), which provides in part that it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites[,]

406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the inquiry was not limited to the importance of compulsory school attendance generally. Also needed was an examination of "the impediment to those objectives that would flow from recognizing the claimed . . . exemption." *Id.* at 221, 92 S.Ct. at 1536, 32 L.Ed.2d at 28.

The state contends that widespread civil disobedience will result if Athabascans are allowed to take moose out of season when necessary for a funeral potlatch. As the state's brief colorfully puts it: "Alaskans seem to have a marked tendency to come unglued over fish and wildlife allocation issues." The state predicts as a result, general non-observance of the game laws, a "downward spiral into anarchy", "poaching and creek robbing," and "tragic confrontations" between recreational hunters and Athabascans.

We give no credence to this argument. It is, first of all, not supported by any evidence. Moreover, its prediction of general lawlessness is an extreme and unwarranted comment on the general character of the state's citizens. Interests which justify limitations on religious practices must be far more definite than these. "Justifications founded only on fear and apprehension are insufficient to overcome rights asserted under the First Amendment." *Teterud v. Burns*, 522 F.2d 357, 361–62 (8th Cir. 1975). *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, 739 (1969).

The state does not urge that an exemption granted to Athabascans needing moose meat for a funeral potlatch will result in so many moose taken as to jeopardize appropriate population levels. The trial record is silent on that question. We are not advised as to how many funeral potlatches are held each year, nor how many moose are legally taken, nor the level of harvest which would cause a population decline. All the record reveals is that there was but one funeral potlatch in Minto in 1975, and that one moose was needed for it. The burden of demonstrating a compelling state interest which justifies curtailing a religiously based practice lies with the state.[10] On this record, that burden has not been met.

### IV

Finally, we turn to the state's argument that granting an exemption in this case would amount to an establishment of religion contravening the establishment clauses of the first amendment to the United States Constitution and article I, section 4 of the Alaska Constitution.[11] These clauses are designed to prevent "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701 (1970). *See Bonjour v. Bonjour*, 592 P.2d 1233, 1241–42 (Alaska 1979). Accommodating the religious beliefs of Athabascans by permitting the killing of a moose for a funeral potlatch does not rise to the level of these

was largely motivated by laws such as those seeking to preserve endangered species. The House report accompanying 42 U.S.C.A. § 1996, notes that Indian peoples have long sought protective legislation for certain species and yet

> such laws, when combined with more restrictive regulations, insensitive enforcement procedures and administrative policy directives, . . . have interfered severely with the culture and religion of American Indians.

H.R.Rep.No.1308, 95th Cong., 2nd Sess. 3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1262, 1263. It is suggested by the House report that such impacts "upon the exercise of traditional Indian religious practices" are not in "compliance with the constitutional injunction that Congress shall make no laws abridging the free exercise of religion." *Id.* at 1262. *See also* 16 U.S.C.A. § 668a (Supp.1979), which authorizes the taking of bald eagles "for the religious purposes of Indian tribes," and 25 C.F.R. § 11.87H (1978), which declares it to be lawful for one to "buy, sell, possess, or use peyote in any form in connection with the religious practices, sacraments or services of the Native American Church." 21 C.F.R. § 1307.31 (1979) also exempts the religious use of peyote.

10. *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 972 (1963).

11. *See* notes 2 and 3 *supra*.

interests. The purpose of such an accommodation is merely to permit the observance of the ancient traditions of the Athabascans.[12] As such, the exemption "reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." *Wisconsin v. Yoder*, 406 U.S. 205, 234, n. 22, 92 S.Ct. 1526, 1543 n. 22, 32 L.Ed.2d 15, 36, n. 22 (1972), quoting *Sherbert v. Verner*, 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965, 974 (1963).[13] Arguments similar to the state's were dismissed as plainly wrong in *Sherbert* and *Yoder*.[14]

## V

If the reason the state did not urge that exemptions for funeral potlaches will endanger moose ·populations is that such a showing cannot be made, the state may be well advised to adopt regulations governing the taking of moose for such purposes. Carefully designed regulations would have the effect of guarding against abuses and aid in record keeping, which would be of value in determining the impact of the exemption on moose populations. There exist models for similar religious accommodations. For example, 16 U.S.C.A. § 668a (Supp.1979), authorizes the Secretary of the Interior to allow eagles to be taken "for the religious purposes of Indian tribes," upon a finding that the taking is compatible with the preservation of the species. Regulations have been published implementing this. 50 C.F.R. § 22.22 (1978). Similarly, the Wisconsin legislature has recently enacted a statute permitting the taking of deer by Winnebago Indians for religious ceremonies, and has directed the state Department of Natural Resources to promulgate appropriate regulations.[15]

In view of the result we have reached we have no occasion to consider the appellant's other claims.

The judgment is reversed and this case is remanded with instructions to dismiss the complaint.

CONNOR, J., dissents.

CONNOR, Justice, dissenting.

I must respectfully dissent.

On the record I am unable to conclude that a freshly killed moose was necessary to

---

12. *See, e. g., Jones v. Butz*, 374 F.Supp. 1284, 1292 (S.D.N.Y.), aff'd.·mem., 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974), holding 7 U.S. C.A. § 1902(b) (Supp.1979), which exempts certain religiously prescribed methods of animal slaughter from the requirements of the Humane Slaughter Act, to be consistent with the establishment clause.

13. One commentator has suggested that no accommodation which is even "arguably compelled" by the free exercise clause can violate the establishment clause:

In attempting to distinguish between situations where accommodating programs to religious needs has been held excessive and those where it has been held permissible or even mandatory, it is helpful to posit a dichotomy between *governmental actions arguably (even if not beyond doubt) compelled by the free exercise clause*, and *governmental actions supportive of religion in ways clearly not mandated by free exercise*. Actions "arguably compelled" by free exercise are not forbidden by the establishment clause.
L. Tribe, American Constitutional Law 822 (1978) (emphasis in original). *See also Wond-*

*zell v. Alaska Wood Products, Inc.*, 601 P.2d 584, Opn. No. 1720 (Alaska, 1979).

14. As a part of its argument concerning the establishment clause the state contends that the state, and the courts, will become unduly entangled in religion by the necessity of separating spurious claims from genuine ones. While it is correct that there can be no judicial examination of the truth of a religious belief, *United States v. Ballard*, 322 U.S. 78, 86–87, 64 S.Ct. 882, 886–887, 88 L.Ed. 1148, 1154 (1944), whether a religious belief is sincerely held is a proper subject of adjudication. *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733, 747 (1965); *People v. Woody*, 61 Cal.2d 716, 40 Cal.Rptr. 69, 77, 394 P.2d 813, 821 (1964); *In re Grady*, 61 Cal.2d 887, 39 Cal.Rptr. 912, 913, 394 P.2d 728, 729 (1964).

15. Wis.Stat.Ann. § 29.106 (West Supp. 1978–79). Detailed administrative regulations, promulgated prior to the statute had achieved the same end. *See* Wis. Dep't. of Nat. Resources, Sec'y's Directive, "Taking of Deer by Winnebago Indians for Religious Purposes" (Dec. 15, 1976).

conduct the funeral potlatch. While it is traditional that as many native foods as possible should be served, it has not been established by the evidence in this case that fresh moose meat is indispensible for such a ceremony.[1] It is merely desirable that such meat be served at those functions.[2] For this particular potlatch there was already on hand a moose hind quarter, bear meat, and fish. No ducks, porcupine, rabbit or caribou were used, although they are also considered native food which may be served at a funeral potlatch. To the extent that moose meat was desirable because it had magico-religious, i. e., symbolic, significance, it was already available.

Unless the use of fresh moose meat rises to the level of a cardinal religious principle, unless it is central to a religious observance, it cannot qualify as a practice protected by the "free exercise" clauses of either the state or federal constitutions. *See Wisconsin v. Yoder*, 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15, 27 (1972); *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 971 (1963).

Because there was not a sufficient showing made here a case for the application of those clauses was not made out.

For these reasons, I would affirm the judgments of the district and superior courts.

---

1. Although the anthropologists presented by appellant testified that, on the basis of their personal observations, they believed the use of fresh moose meat at a funeral potlatch is an important tradition of the Athabascan culture, they were not aware of any documentation showing that it is essential or required.

2. Former Tribal Chief Peter John testified that there could be a potlatch without wild meat, "but then I don't think I'll enjoy it." He also testified that although "it would be best to have . . . fresh meat," it would not be a disgrace to serve frozen moose meat.