NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | Court of Appeals Nos. | Trial Court Nos. |
|---|---|---|
| DAVID PHILLIP | A-11580, A-11620 | 4BE-12-580 CR |
| BRIAN IVAN | A-11581, A-11659 | 4BE-12-627 CR |
| JOSEPH SPEIN | A-11582, A-11650 | 4BE-12-629 CR |
| NOAH OKOVIAK | A-11583, A-11679 | 4BE-12-571 CR |
| SAMMY JACKSON II | A-11584, A-11669 | 4BE-12-591 CR |
| KENNETH ANDREWS | A-11585, A-11629 | 4BE-12-583 CR |
| SAMMY JACKSON I | A-11586, A-11640 | 4BE-12-590 CR |
| JAMES ALBRITE | A-11588, A-11619 | 4BE-12-582 CR |
| MICHAEL M. ANDREW | A-11594, A-11670 | 4BE-12-602 CR |
| JOHN I. OWENS | A-11595, A-11649 | 4BE-12-595 CR |
| PETER W. HINZ | A-11596, A-11630 | 4BE-12-575 CR |
| MICHAEL FRYE and | A-11604, A-11660 | 4BE-12-567 CR |
| PATRICK F. BLACK, | A-11605, A-11639 | 4BE-12-560 CR |

Appellants/
Cross-Appellees,

v.

STATE OF ALASKA,

Appellee/
Cross-Appellant.

O P I N I O N

No. 2446 — March 27, 2015

Appeal from the District Court, Fourth Judicial District, Bethel, Bruce G. Ward, Judge.

Appearances: Thomas M. Daniel and Sarah J. Fisher, Perkins Coie, LLP, and James J. Davis Jr. and Goriune Dudukgian, Northern Justice Project, LLC, Anchorage, for the Appel-

lants/Cross-Appellees. John M. Starkey, Law Office of John Sky Starkey, LLC, and Thomas Stenson, ACLU of Alaska Foundation, Anchorage, as *amici curiae*, aligned with the Appellants/Cross-Appellees. Laura Fox, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee/Cross-Appellant.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge ALLARD.

In June 2012, the thirteen defendants in this case — all Yup'ik fishermen living a subsistence lifestyle — were charged with violating the Alaska Department of Fish and Game's emergency orders restricting fishing for king salmon on the Kuskokwim River. The defendants moved for dismissal of the charges, asserting that their fishing for king salmon was religiously based activity, and that they were entitled to a religious exemption from the emergency orders under the free exercise clause of the Alaska Constitution.

The district court denied the motion to dismiss, holding that the religious exemption claimed by the Yup'ik fishers would defeat the State's compelling interest in protecting the sustainability of the species. Following this ruling, all thirteen defendants were convicted in bench trials.

On appeal, the defendants renew their claim that their fishing for king salmon was protected under the free exercise clause. For the reasons explained here, we reject that claim and affirm the decision of the district court.

_____

[*]    Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

*Background*

The Kuskokwim River's king salmon run tends to be "boom and bust," with periods of high abundance followed by periods of low abundance, due to many variables. From 2003 until 2007, the Kuskokwim River had above average king salmon runs, but in subsequent years the numbers declined. In 2011, for the first time, the run was so low that the long-term sustainability of the king salmon population appeared threatened.

Preparing for the 2012 fishing season, the Alaska Department of Fish and Game initially predicted that the king salmon run on the Kuskokwim River would number 197,000. The Department concluded that 127,000 king salmon needed to reach the spawning grounds in the Kuskokwim's various tributaries in order to protect the sustainability of the river's king salmon population.[1] The Department's plan was supported by the Kuskokwim River Salmon Management Working Group, a group set up to give subsistence, sport, and commercial fishers a voice in managing the river's salmon populations.

However, by early June 2012, far fewer king salmon had appeared in the river than the Department's initial forecasts, and state fisheries biologists and managers realized that the run "wasn't going to come in as expected." With the support of the Working Group, the Department announced a seven-day emergency closure prohibiting hook-and-line fishing for king salmon, and limiting the use of other fishing gear that was

---

[1]   Alaska Statute 16.05.258 addresses the subsistence use and allocation of fish. That statute requires the Board of Fisheries to identify the fish stocks or portions of fish stocks that can be harvested consistently with sustained yield. *See* AS 16.05.258(b). If the Board determines that a fish stock can be harvested consistently with sustained yield, the Board is required to adopt regulations providing a reasonable opportunity for subsistence use. *See* AS 16.05.258(b)(1)-(4). However, the taking of fish authorized under this statute "are subject to regulations regarding open and closed areas, seasons, methods and means, marking and identification requirements, quotas, bag limits, harvest levels, and sex, age, and size limitations." AS 16.05.258(e).

optimal for catching kings. These were "rolling closures," meaning the location of the restrictions moved up the river along with the king salmon they were designed to protect.

Five days into this emergency closure, the number of king salmon in the river remained extremely low; the Department of Fish and Game now estimated that only 30,000 king salmon would reach the spawning grounds — almost 100,000 below what the Department considered necessary to sustain the run. Faced with these projections, the Department extended the fishing gear restrictions by issuing additional emergency orders.

Under the Department's emergency orders, only gillnets with four-inch or smaller mesh size and a length of no more than sixty feet were allowed. It was possible, and legal, to catch king salmon with such nets, but they were designed to catch smaller species, such as whitefish, and they were an inefficient method of catching any salmon. In late June, when the chum and sockeye salmon started up the river, the Department loosened the gear restriction to allow gillnets with a six-inch mesh size, in an attempt to minimize the king catch while allowing harvest of chum and sockeye. By the time six-inch gillnets were allowed, the main species in the river were chum and sockeye salmon, and the Department did not expect kings to be caught in significant numbers. (A larger, eight-inch net is optimal for catching kings when chum and sockeye are present.)

Even with these gear restrictions, about 20,000 Kuskokwim-bound kings were caught during the 2012 fishing season. Most of this catch was incidental, occurring during the periods when four- and six-inch mesh gillnets were allowed. According to the preliminary estimates available to the district court, the total escapement for the 2012 season (that is, the estimated total number of king salmon that reached the spawning grounds) was 77,000.

About sixty people were cited for violating the June 2012 emergency orders on the Kuskokwim River. Some of these fishers were allowed to keep one king salmon,

– 4 – 2446

but the rest of their illegally caught kings were donated to charity. Some of the violators pleaded guilty to the charges; others went to trial at various points between the fall of 2012 and spring of 2013, and were convicted.

Among the defendants who eventually went to trial were the thirteen Yup'ik fishermen whose claims are at issue in this appeal. They were all charged with the offense of using gillnets that were prohibited under the emergency orders. The conduct and motivations of these fishermen varied. Some had apparently been told by their tribal offices that they could fish; others claimed to have been mistaken about the size of their nets; and still others knowingly broke the law in protest of the emergency orders. Of the thirteen fishermen involved in this appeal, some caught just a few king salmon, while others caught as many as sixty.

These thirteen defendants waived any individual defenses they might have had, and instead they filed a collective brief asserting that their fishing in violation of the emergency orders was religiously based conduct that was protected under the free exercise clause of the Alaska Constitution. The district court ordered an evidentiary hearing on this claim.

At the hearing, the State presented evidence that the emergency orders were justified because the projected 2012 Kuskokwim River king salmon run was so perilously small that any additional harvesting of king salmon would have jeopardized the sustainability of the run. The defendants, in turn, presented expert testimony on the central role that fishing for king salmon plays in Yup'ik culture and spiritual beliefs.

The defense experts testified that according to traditional Yup'ik belief, Ellam Yua is the spirit of the universe, consisting of all things in a state of interconnectedness. Ellam Yua provides the Yup'ik with the resources they need to survive, and the Yup'ik are expected to work hard to harvest those resources. If the

Yup'ik stop fishing for salmon, Ellam Yua will take offense, and the salmon will cease to make themselves available.

The experts also testified that along the Kuskokwim River, where all of the defendants lived, king salmon is regarded as "the most important food." It is the "apex" fish, and it is irreplaceable. Other fish and other species of salmon are acceptable for eating, but they are not viewed as an adequate substitute for kings, in part because king salmon is the first salmon to return to the Kuskokwim River in the spring, and it arrives during the prime drying season.

The testimony also established that king salmon play a central role in traditional Yup'ik fish camps, which is where Yup'ik spiritual values are taught to the next generation.

Based on this expert testimony, the district court judge found that the defendants had a religious interest in fishing for king salmon. But the judge ruled that even assuming the sincerity of each individual defendant's religious belief, the State's compelling interest in preserving the Kuskokwim River king salmon run outweighed that religious interest.[2]

Each defendant was then convicted of violating the emergency orders. The defendants now appeal the district court's ruling that they were not entitled to a religious exemption from the Department's gear restrictions. The State cross-appeals, arguing that the district court erred in finding that the defendants' conduct in fishing for king salmon with prohibited gear was religiously based conduct.

---

[2] At the subsequent trials, the defendants testified regarding the sincerity of their religious beliefs and the district court found that the defendants were sincere in their religious beliefs.

*Why we conclude that the religious exemption the defendants sought would harm a compelling state interest*

In Alaska, the test for whether an individual is entitled to a religious exemption from a facially neutral law is set out in the Alaska Supreme Court's decision in *Frank v. State*.[3]

In *Frank*, the defendant, an Athabascan, was convicted of transporting illegally taken game after he participated in a hunt to provide a moose for a funeral potlatch.[4] Frank admitted that he transported the moose, but he argued that applying the state's game regulation to him abridged his freedom of religion.[5]

After an evidentiary hearing, the district court found that the funeral potlatch was an integral part of the religious beliefs of the central Alaska Athabascan Indians, and

---

[3]    604 P.2d 1068 (Alaska 1979); *see also Swanner v. Anchorage Equal Rights Com'n*, 874 P.2d 274, 282 (Alaska 1994) (reaffirming the *Frank* test for purposes of the Alaska Constitution and choosing not to follow federal constitutional law under *Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872 (1990)).

Under the federal constitution, the free exercise clause is not implicated by a religiously neutral and generally applicable law. *See Smith*, 494 U.S. at 879. In response to the Supreme Court's decision in *Smith*, Congress passed the Religious Freedom Restoration Act of 1993 (RFRA), which prohibits the federal government from enacting a neutral and generally applicable law that substantially burdens a person's free exercise of religion unless the government can demonstrate that the law is the least restrictive means of furthering a compelling government interest. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2761 n.3 (2014) (RFRA's least restrictive means requirement provides broader protection for religious liberty than was available under the free exercise line of cases preceding *Smith*). RFRA, however, does not bind the states. *See City of Boerne v. Flores*, 521 U.S. 507, 533-34 (1997).

[4]    *Frank*, 604 P.2d at 1069.

[5]    *Id.*

that Frank sincerely held those beliefs.[6] The court also found that the Athabascan Indians considered moose more desirable than any other food for potlatch celebrations.[7] But the district court nevertheless concluded that the State's game regulation had not deprived Frank of his religious freedom because, however desirable it might be to have moose at a funeral potlatch, it was not "specifically required for this ceremonial occasion."[8]

In reversing that decision, the Alaska Supreme Court announced a two-part test for assessing whether an individual is entitled to a religious exemption from a facially neutral law under the Alaska free exercise clause.[9]

The first part of the test, which assesses the validity of the individual's religious interest, comprises three inquiries: (1) whether religion was involved; (2) whether the conduct at issue was religiously based; and (3) whether the claimant is sincere in his beliefs.[10] The second part of the test assesses whether the State can meet its burden of proving a compelling state interest that would justify curtailing the religiously based practice.[11]

Applying the first part of the test to Frank's claim, the supreme court concluded that the district court's findings supported the conclusion that the funeral potlatch was a religious ceremony, that Frank's conduct in transporting the moose was

---

[6]  *Id.*

[7]  *Id.*

[8]  *Id.*

[9]  *Id.* at 1071.

[10]  *Id.*

[11]  *Id.*

religiously based, and that his religious beliefs were sincere.[12] The supreme court also concluded, however, that the district court had improperly rejected Frank's claim based on its finding that moose meat was not "essential" for the observance of a funeral potlatch.[13] The proper question, the supreme court declared, was not whether the eating of moose at the funeral was essential, but rather whether the practice was "deeply rooted in religious belief."[14] The court found "the evidence inescapable that the utilization of moose meat at a funeral potlatch is a practice deeply rooted in the Athabascan religion."[15]

The supreme court then turned to the second part of the test. The court found that the State had an indisputably compelling interest in maintaining a healthy moose population.[16] But the court concluded that this was only the start of the inquiry: the State also must show that its interest "will suffer if an exemption is granted to accommodate the religious practice at issue."[17]

The court concluded that the State failed to meet this burden in *Frank*. The court noted that the State had failed to offer *any* evidence that granting a religious exemption to the Athabascan Indians to obtain moose meat for funeral potlatch celebrations would jeopardize Alaska's moose populations: "We are not advised as to how many funeral potlatches are held each year, nor how many moose are legally taken, nor the level of harvest which would cause a population decline ... [a]ll the record reveals is that there was but one funeral potlatch in Minto in 1975, and that one moose was

---

[12] *Id*. at 1073.

[13] *Id*. at 1072-73.

[14] *Id*. at 1072.

[15] *Id*. at 1073.

[16] *Id*.

[17] *Id*.

needed for it."[18] The court further noted that the State could adopt regulations governing the religious exemption and that such regulations could guard against abuses and also aid in record keeping so that the State could determine what impact, if any, the religious exemption might have on the moose population.[19]

*The application of <u>Frank</u> to the present case*

The defendants in this case argue that *Frank* entitles them to a religious exemption from the gear restrictions imposed by the emergency orders. They assert that their subsistence fishing for king salmon in violation of the emergency orders was religiously based conduct and that the State failed to meet its burden to show that the Department's emergency orders were the "least restrictive means" available to preserve the health of the king salmon population. The defendants point to several alternative measures that they argue could have protected the salmon run without abridging their religious interest — closing down the Kuskokwim Bay commercial fishery, implementing Tier II subsistence allocations,[20] or limiting the Bering Sea pollock bycatch.

---

[18]   *Id.* at 1074.

[19]   *Id.* at 1075; s*ee* 5 AAC 92.019(d) (providing for an affirmative defense to prosecution for hunting or taking big game outside of season or bag-limit restrictions when the meat is used in certain religious ceremonies) (effective Aug. 8, 1987).

[20]   Under the "Tier II" permitting system, if the harvestable portion of the fish stock is not sufficient for all subsistence uses, the state may distinguish among subsistence users based on their customary dependence on the fish stock and their ability to obtain food if subsistence use is restricted or eliminated. *See* 5 AAC 92.062(a); *see also* AS 16.05.258-(b)(4)(B) (authorizing the adoption of regulations distinguishing among subsistence users based on their customary and direct dependence on the fish stock as a mainstay of livelihood, the proximity of their domicile to the stock, and the ability of the subsistence user to obtain food if subsistence use is restricted or eliminated).

But the evidence presented to the district court established that these alternatives were either impractical or impossible to implement mid-season or that they would not have appreciably increased the numbers of king salmon.

Moreover, the defendants' arguments misconstrue the State's evidentiary burden under *Frank*. Once the district court found the defendants' fishing in violation of the emergency orders was religiously based conduct, the burden shifted to the State to establish that its compelling interest in preserving the viability of the Kuskokwim king salmon population "will suffer if an exemption is granted to accommodate the religious practice at issue."[21] Contrary to defendants' arguments, the State was not required to show that there were no other conceivable means to protect the salmon.

Nor do we think such a test would be appropriate in these circumstances. In *Larson v. Cooper*, the supreme court declined to interpret *Frank* as requiring the State to prove that the prison regulations that restricted prisoners' free exercise of religion were the least restrictive means available, reasoning that courts are "ill-positioned to second-guess prison administrators' judgment," and that subjecting the day-to-day decisions of prison officials to an inflexible strict-scrutiny analysis "would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."[22]

The supreme court has similarly observed that courts are "singularly ill-equipped to make natural resource management decisions."[23] Here, the State's evidence

---

[21] *Frank*, 604 P.2d at 1073.

[22] *Larson v. Cooper*, 90 P.3d 125, 132-33 (Alaska 2004).

[23] *Native Vill. of Elim v. State*, 990 P.2d 1, 8 (Alaska 1999); *see Charles v. State*, 232 P.3d 739, 745 (Alaska App. 2010) (noting that the district court should not second-guess the wisdom or efficacy of game regulations because "[m]anaging game for subsistence and other competing uses is a complex task that requires considerable expertise").

established that in-season management of salmon populations requires "rapidly evolving" responses to "day-by-day assessment[s]." The facts of this case are illustrative: the Department of Fish and Game initially set a management objective of 127,000 king salmon, but by early June, it appeared that this objective was based on wildly optimistic forecasts and that as few as 30,000 king salmon might make it to the spawning grounds in the Kuskokwim River and its tributaries. This number was so low that the fisheries manager for the area worried that 2012 would be the year that would "wipe out the run." The State presented evidence that even a one-day general opening in June could have killed 10,000 or more king salmon, and the projections at that time showed that the population did not have 10,000 salmon to spare. Ultimately, the Department's worst fears were not realized, as an estimated 77,000 king salmon made it up to the river's spawning grounds, and another 20,000 were harvested incidentally by subsistence users.

In light of the time pressures and scientific uncertainty that accompany in-season management of salmon stocks, including the Kuskokwim River king salmon run, we conclude that it would seriously hamper the Department's ability to manage the fishery for sustained yield if courts required the State to show that *each* emergency action it took was the least restrictive alternative available.[24] We therefore reject the defendants' formulation of the State's burden in this case. Instead, we agree with the district court that the question under *Frank* is whether the State can meet its burden of proving that its compelling interest in maintaining a healthy and sustainable king salmon population would be harmed if the court granted the religious exemption sought by the defendants.

We also agree with the district court that the State met that burden here. The district court found that "the natural consequence of allowing the unfettered taking of

---

[24] *See* Alaska Const. art. VIII, § 4 (providing that state fisheries "shall be utilized, developed, and maintained on the sustained yield principle"); 5 AAC 07.365 (providing guidelines for managing the Kuskokwim River salmon fisheries for sustained yield).

Chinook [king] salmon under the religious free exercise exception through subsistence harvest urged by the defendants" would be "the decimation of the species by over fishing." This finding is well-supported by the testimony of the fisheries biologists and the extensive data presented at the evidentiary hearing.

The defendants argue that the district court erred in characterizing the religious exemption they sought as "unfettered fishing"; they claim that the only exemption they sought was to "briefly pursue king salmon."

We disagree with the defendants' characterization of the record. In the district court, twenty-two defendants joined the motion to dismiss. Like the thirteen defendants who remain in this appeal, the conduct and motivations of these twenty-two defendants varied, as did the amount of fish they caught, the length of time they fished, and the type of prohibited gear they used.

Their defense attorney, who was representing them collectively, argued that the question before the district court was whether the conduct of these twenty-two defendants jeopardized the State's compelling interest in protecting the Kuskokwim River king salmon run. The defense attorney pointed to the testimony of a State witness, a federal biologist, who testified that the sustainability of the run would not have been threatened by allowing twenty-two people to fish for a "brief period" on one day.

But, as the district court recognized, this was not the correct framing of the legal question. The defendants were asking the court to recognize, as a free exercise defense to criminal charges, a religious exemption that would apply to all Yup'ik subsistence fishers who shared similar religious beliefs and engaged in similar conduct. The defendants did not show that they all fished for only a "brief period"; nor did they assert that their religious interest could be satisfied by fishing for a brief period of time or by harvesting only a limited number of kings.

To the contrary, the defendants offered expert testimony that "having a full fish rack" of king salmon was religiously important for the Yup'ik. A Yup'ik elder testified that subsistence fishing for king salmon is sacred to *all* Yup'ik fishers; that the whole family participates in subsistence fishing; and that it was spiritually important to "successfully ... harvest[] the resource." He declared that Yup'ik religious or spiritual precepts require fishers "to make an effort to catch ... the king salmon ... that was available on the river at that particular time." Given this record, we conclude that it was not error for the district court to find that the defendants had essentially asserted a religious right to "unfettered" subsistence fishing.

The defendants have similarly improperly framed the legal question to be answered in this appeal. They argue that, under the second part of the *Frank* test, the question is whether the State showed that the collective conduct of these particular defendants, standing alone, threatened the State's interest in protecting the Kuskokwim River king salmon run. But that is not the proper analysis under *Frank*. As the supreme court explicitly recognized in *Frank*, the religious exemption Frank sought would apply to *all* Athabascans needing moose meat for a funeral potlatch, not just to Frank personally.[25] Likewise, the religious exemption being sought here is the right of *all* Yup'ik subsistence fishers to fish for king salmon according to their sincerely held religious beliefs without regard to emergency closures or gear restrictions.

Once this legal question is properly framed, we have little difficulty upholding the district court's finding that the State's compelling interest in preserving the viability of the Kuskokwim River king salmon run would suffer if the court were to grant the religious exemption sought by the defendants in this case.

We do not address whether a more limited religious exemption might apply under certain circumstances or for certain individuals, as that question is not before us.

---

[25] *Frank*, 604 P.2d at 1074.

Nor do we find it necessary to address the claim the State raises on cross-appeal: whether the district court erred in finding that the defendants' conduct in fishing for king salmon with different types of prohibited gear was religiously based conduct. As we have just explained, even assuming the defendants met that burden, the religious right they asserted was outweighed by the State's compelling interest in maintaining the health of the Kuskokwim River king salmon population.

*Conclusion*

We AFFIRM the judgments of the district court.

2446