**Patrick C. HUFFMAN, N.D., and Amy Reedy–Huffman, C.P.M., Appellants,**

v.

**STATE of Alaska, Appellee.**

**No. S–12846.**

Supreme Court of Alaska.

April 3, 2009.

---

Tim Cook, Cook & Associates, Anchorage, Paul H. Bratton, Law Office of Paul H. Bratton, Talkeetna, for Appellants.

James E. Cantor, Chief Assistant Attorney General, Talis J. Colberg, Attorney General, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

All public school children must be tested for tuberculosis. State regulations require the use of a purified protein derivative (PPD) skin test for this purpose. The test may be waived if, in the opinion of a physician, it would be injurious for a particular child.

The appellants, Patrick Huffman and Amy Reedy–Huffman, believe that the PPD test would be injurious for their children. They submitted an affidavit so stating signed by Patrick, who is a naturopathic doctor. The Kenai Peninsula School District found the waiver affidavit insufficient because state regulations require such affidavits to be signed by a physician entitled to practice medicine or osteopathy. Accordingly, the district notified the Huffmans that their children would be excluded from school unless they took PPD tests.

The Huffmans sued the school district and the State of Alaska. They contended that the children were entitled to a waiver and alternatively that the test requirement violated their religious and liberty interests. From a summary judgment rejecting these claims, they now bring this appeal. We hold that although their waiver application was correctly rejected and they did not show that their objections were religiously based, they did present a plausible claim that their fundamental liberty interests were infringed. We therefore remand with instructions to determine whether the Huffmans' fundamental right to make decisions about their children's medical treatment can be accommodated by other tests that are acceptable to them while also satisfying the compelling public health interests of the State.

## II. FACTS AND PROCEEDINGS

In August 2006 Patrick Huffman and Amy Reedy–Huffman enrolled their sons Stone and Elias Huffman in fourth grade and kindergarten, respectively, in public schools in the Kenai Peninsula Borough School District.[1] The schools informed the Huffmans that, pursuant to a state regulation, Stone and Elias could only attend if the children had a PPD skin test for tuberculosis or qualified for a medical exemption. A PPD skin test involves injecting a solution containing purified protein into the skin on the forearm; a reaction signifies a latent or active tuberculosis infection rather than the active disease. The Huffmans submitted affidavits to the school district intended to fulfill the requirements for medical exemptions for each son. These documents were signed by Dr. Dawn Lamb, a naturopath, as well as Patrick Huffman.[2] The Huffmans also submitted an objection to the tuberculosis test requirement on religious grounds.[3]

---

1. The record in this case provides only minimal information about the relevant facts. Because the Huffmans lost their case on summary judgment, we treat them as the non-moving party and draw all reasonable inferences of fact in their favor. *Cf. Scott v. Briggs Way Co.*, 909 P.2d 345, 346 n. 3 (Alaska 1996).

2. The record contains only unsigned copies of affidavits indicating they are the statements of Patrick Huffman and no documents signed by, or naming as their author, Dr. Lamb. The State discussed the submission of affidavits from each individual to the school district in a motion to dismiss that it filed in the superior court and does not argue now that the Lamb affidavit does not exist or that Patrick Huffman's statement was never signed. We assume for purposes of this appeal that the documents as described by the Huffmans were submitted to the school district.

3. This document is not in the record, but the State does not argue that the school district did not receive it, and the district's response to the

In November the school district's health services department informed the Huffmans that their children were excluded from school as of December 15 or 16 for failure to comply with the state regulation regarding tuberculosis testing. The department sent an additional letter to the Huffmans explaining that "[w]e as a School District are not given any latitude within which to respond to your concern" regarding the PPD skin test because the regulation, 7 Alaska Administrative Code 27.213, requires a statement from an "MD or DO" and "does not include any provision for religious exemption."

The Huffmans filed suit in the superior court alleging that (1) they had complied or substantially complied with the requirement to obtain a medical exemption; (2) they had "a liberty interest, protected by the due process, equal protection, and privacy clauses" of the state and federal constitutions, "to determine matters affecting the health and well-being of their minor children"; and (3) the regulation violated their religious freedom by excluding their children from public schools unless they allowed their children to undergo a medical procedure contrary to their religious beliefs.[4] Both parents submitted short affidavits to the court; these affidavits contain the only evidence in this case regarding their free exercise claim. Patrick Huffman stated in his affidavit that he sees "religion not only as a stated view of the world, but also as a practice in which my beliefs are part of every aspect of my lifestyle choices" and that one of his "fundamental" beliefs is that "the body [is] a sacred vessel of the soul." Thus, he wrote, "[i]t therefore runs in stark opposition to our religion to introduce a substance into the body which could potentially cause harm without any known benefit to, and in the absence of any known ... danger to our children's health status." In her affidavit, Amy Reedy–Huffman said that it was her "deeply held religious belief that to introduce a potentially harmful substance into a healthy body is wrong and irresponsible."

The State filed a motion to dismiss the Huffmans' claims or, in the alternative, for summary judgment; the Huffmans also filed a motion for summary judgment. The State filed an opposition to the Huffmans' summary judgment motion.[5] In their reply to the State's motion, the Huffmans indicated that they would be willing to have their children take either of two alternative tests for the presence of tuberculosis: a sputum test, which shows the presence of active tuberculosis, and the QuantiFERON–TB Gold test, which they claimed was "at least as effective" as the skin test in detecting latent TB. The superior court granted summary judgment in favor of the State, holding that as a matter of law (1) the Huffmans had not complied or substantially complied with the regulation requiring a PPD test or waiver from a physician; (2) naturopaths were not physicians; and (3) the Huffmans' constitutional claims were invalid.

In December 2006, before their children were to be suspended from school, the Huffmans requested a preliminary injunction prohibiting the school district from excluding Stone and Elias pending the outcome of the suit. They withdrew that demand four days later because the State and district agreed to allow the children to continue to attend school.

The Huffmans appeal, raising the same claims they presented below.

## III.  STANDARD OF REVIEW

We review a grant of summary judgment with independent judgment.[6]

---

Huffmans suggests it was aware of a religious objection.

**4.** The Huffmans originally named the Kenai Peninsula Borough School District as the only defendant; they also named the State in their amended complaint. On appeal, the school district argued it was improperly joined as a party to this action, and we granted that unopposed request to be dismissed from the case. Thus the State is now the sole defendant.

**5.** The school district also filed a response, opposing the Huffmans' motion only "to the extent that it could be read to compel the School District to violate state law."

**6.** *Air Logistics of Alaska, Inc. v. Throop*, 181 P.3d 1084, 1089 (Alaska 2008) (citing *DeNardo v. Bax*, 147 P.3d 672, 676 (Alaska 2006)).

Questions of statutory interpretation and constitutional law are likewise reviewed de novo.[7]

## IV. DISCUSSION

7 Alaska Administrative Code (AAC) 27.213 requires, in relevant part, that all students new to a public school district take a PPD skin test for tuberculosis within ninety days of enrolling.[8] The district "shall suspend a child" who does not submit to such a test or provide a health care provider's written and signed statement that the child "is not infectious from tuberculosis to others."[9] The regulation allows an exemption for any child who provides "the affidavit of a physician lawfully entitled to practice medicine or osteopathy in this state stating the opinion that the PPD skin test to be administered would be injurious to the health and welfare of the child or members of the family or household."[10]

The Huffmans claim that their waiver from a naturopath fulfills the requirements of this regulation and that the regulation violates their religious freedom, as well as their liberty and privacy interests, under the state and federal constitutions.

### A. Waiver from a Naturopath Does Not Fulfill the Requirements of 7 AAC 27.213.

The Huffmans contend that the district should have treated the waiver they submitted, signed by a naturopath, as sufficient to comply with 7 AAC 27.213(f). They argue that the regulation's reference to waiver by "a physician" includes the statement of a naturopath. They rely on *Thoeni v. Consumer Electronic Services,*[11] in which we

held that a psychologist could be a physician under a statute that stated " 'physician' includes doctors of medicine, surgeons, chiropractors, osteopaths, dentists, and optometrists" because that list was not exclusive.[12] The State believes the text of the regulation at issue here—the waiver must be signed by "a physician lawfully entitled to practice medicine or osteopathy"[13]—excludes naturopaths.

■ The statutory framework and language governing the practice of medicine and naturopathy make clear that a naturopath's signature is not sufficient for purposes of a 7 AAC 27.213(f) waiver. Chapter 64 of the state's statutory code, "Medicine," defines the " 'practice of medicine' or 'practice of osteopathy'" as providing diagnosis of or treatment for a mental or physical condition for a fee or other consideration, as well as "to use or publicly display a title in connection with a person's name including 'doctor of medicine,' 'physician,' 'M.D.,' or 'doctor of osteopathic medicine' or 'D.O.' "[14] Chapter 45 of the code, "Naturopaths," defines naturopathy as "the use of hydrotherapy, dietetics, electrotherapy, sanitation, suggestion, mechanical and manual manipulation for the stimulation of physiological and psychological action to establish a normal condition of mind and body."[15] The legislature has forbidden any person practicing naturopathy from "us[ing] the word 'physician' " in his title.[16] The licensing requirements for practicing medicine and practicing naturopathy are distinct and contained in these separate chapters of the code.[17] Whereas a medical doctor must have attended an accredited medical school and completed a hospital residency or

---

7. *Bodkin v. Cook Inlet Region, Inc.,* 182 P.3d 1072, 1076 (Alaska 2008) (citing *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1049 (Alaska 2002)).

8. 7 AAC 27.213(a).

9. 7 AAC 27.213(e).

10. 7 AAC 27.213(f). A child is also exempt from the requirement if she has had a negative PPD skin test in the previous six months or has ever had a positive PPD skin test. *Id.*

11. 151 P.3d 1249 (Alaska 2007).

12. *Id.* at 1258 (quoting AS 23.30.395(31)).

13. 7 AAC 27.213(f)(2).

14. AS 08.64.380(6).

15. AS 08.45.200(3).

16. AS 08.45.050(3).

17. *See* AS 08.64.170 *et seq.* (medicine); AS 08.45.020–.035 (naturopathy).

internship of sufficient length,[18] naturopaths need only have graduated from an accredited school of naturopathy and passed a licensing examination.[19] Because of these significant distinctions in the training and practice of physicians and naturopaths, in addition to the specific language of the regulation, we conclude that the regulation's requirement cannot be fulfilled by a naturopath. Thus the Huffmans did not comply with 7 AAC 27.213(f).[20]

### B. 7 AAC 27.213 Does Not Infringe on the Huffmans' Free Exercise of Religion.

█ The First Amendment of the U.S. Constitution and article I, section 4 of the Alaska Constitution protect religious freedom.[21] The Huffmans argue that the application of 7 AAC 27.213 to their family violates these protections. The Huffmans claim that their religious beliefs prohibit harming the body, and the regulation unconstitutionally burdens the practice of that tenet by preventing their children from attending school unless they submit to a test that inserts a foreign substance into their children's skin.

**18.** AS 08.64.200.

**19.** AS 08.45.030.

**20.** The Huffmans argue in the alternative that their waiver is sufficient for "substantial compliance" because Dawn Lamb and Patrick Huffman specialize in "family and child health care," so their qualifications surpass, for example, those of M.D.s who provide other types of care. This argument fails. Regardless of their specialties, naturopaths do not have the training of physicians, and the regulation requires a person who practices medicine to sign a waiver.

**21.** The federal constitution mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The state constitution commands that "[n]o law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof." Alaska Const. art. I, § 4.

**22.** See Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 878–82, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), superseded by statute, Religious Freedom Restoration Act of 1993, Pub.L. No. 103–141, 107 Stat. 1488.

█ A valid, neutral, generally applicable law cannot violate the free exercise clause of the federal constitution.[22] The regulation at issue here falls into that category and so is not invalid under the First Amendment.

We apply the Alaska free exercise clause differently. In *Frank v. State*,[23] we articulated a threshold test for finding a violation of religious freedom under the Alaska Constitution, writing that "[t]he free exercise clause may be invoked only where there is a religion involved, only where the conduct in question is religiously based, and only where the claimant is sincere."[24] Our opinion in *Frank* did not directly address the preliminary question of whether a religion was involved; our analysis focused on the second prong of the test, relying on "impressive evidence concerning the religion of the Central Alaskan Athabascan people" to determine that moose hunting was a necessary component of a religious ceremony.[25]

Federal cases have considered whether a nontraditional belief system is sufficient to constitute a religion under the free exercise clause and so are instructive here.[26] The United States Supreme Court has emphasized that a personal philosophy is not equivalent to a religion.[27] Subsequent United

**23.** 604 P.2d 1068 (Alaska 1979).

**24.** *Id.* at 1071 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

**25.** *Id.* at 1071–73.

**26.** These cases predated *Employment Division v. Smith* and so apply an earlier interpretation of the federal free exercise clause on which we based our opinion in *Frank*. See *Employment Div., Dep't of Human Res. of Or.*, 494 U.S. at 881–82, 110 S.Ct. 1595 (distinguishing and effectively overruling prior free exercise cases, including *Yoder*); *Frank*, 604 P.2d at 1071 (citing *Yoder*, 406 U.S. at 215, 216, 92 S.Ct. 1526).

**27.** See *Yoder*, 406 U.S. at 216, 92 S.Ct. 1526 ("Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion

States Courts of Appeals cases have endeavored to provide a more concrete definition, focusing on how broad and fundamental an individual's set of expressed beliefs are by considering factors such as whether the premises of the religion relate to ultimate questions and whether there are rituals or other activities associated with it.[28] The Huffmans do not profess to subscribe to any organized religion. They rely solely on their affidavits as evidence of their nontraditional religious beliefs. Their statements use the terms "religion" and "religious beliefs," but they discuss only an opposition to putting harmful substances into the body. The record provides no indication that the Huffmans' feelings are connected to a comprehensive belief system, set of practices, or connection to ideas about fundamental matters. Without such assertions or evidence, we believe summary judgment on this issue was appropriate.[29]

## C. Questions Remain as to Whether 7 AAC 27.213 Unconstitutionally Infringes on the Huffmans' Privacy Interest in Making Decisions About Their Children's Medical Treatments.

■ The Huffmans also argue that 7 AAC 27.213 interferes with their liberty and privacy interests under article I, sections 1 and 22 of the Alaska Constitution.[30] The analysis required to resolve an individual rights claim depends upon the type of right asserted. We described the appropriate inquiries in *Myers v. Alaska Psychiatric Institute*,[31] a case contesting on liberty and privacy grounds the state's power to administer psychotropic medications without a patient's consent:

> We determine the boundaries of individual rights guaranteed under the Alaska Constitution by balancing the importance of the right at issue against the state's interest in imposing the disputed limitation. When a law places substantial burdens on the exercise of a fundamental

Clauses.... [W]e see that the record in this case abundantly supports the claim that the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living."). The United States Supreme Court addressed a related question in interpreting a statutory provision that defined "religious training and belief'" as "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but (not including) essentially political, sociological, or philosophical views or a merely personal moral code." *United States v. Seeger*, 380 U.S. 163, 171–72, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (alteration in *Seeger*) (citation omitted) (internal quotation marks omitted). The Court concluded that "all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent" satisfied the statutory requirement. *Id.* at 176, 85 S.Ct. 850.

**28.** *See, e.g., United States v. Meyers*, 95 F.3d 1475, 1483–84 (10th Cir.1996) (approving a list of five factors upon which the district court below had relied in evaluating a purported religion under the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*: (1) "[u]ltimate [i]deas," (2) "[m]etaphysical [b]eliefs," (3) "[m]oral or [e]thical system," (4) "[c]omprehensiveness of [b]eliefs," and (5) "[a]ccoutrements of [r]eligion"); *Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir.1981) (offering three "useful

indicia" of religion to assist in identifying it for purposes of constitutional claims: a religion (1) "addresses fundamental and ultimate questions having to do with deep and imponderable matters," (2) is "comprehensive in nature," and (3) "often can be recognized by the presence of certain formal and external signs" such as services, clergy, etc. (citing and quoting *Malnak v. Yogi*, 592 F.2d 197, 207–10 (3d Cir.1979) (Adams, J., concurring)) (internal quotation marks omitted)).

**29.** Because we have determined that the Huffmans have not presented evidence that their beliefs qualify as a religion, we do not consider whether their objection to the PPD skin test arises from religious convictions. We do not question, and the State does not dispute, the sincerity of the Huffmans' beliefs as expressed in their affidavits.

**30.** Article I, section 1 provides, in relevant part, that "all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry." Article I, section 22 states: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section." Article I, section 7 also guarantees a liberty right: "No person shall be deprived of life, liberty, or property, without due process of law."

**31.** 138 P.3d 238 (Alaska 2006).

right, we require the state to "articulate a compelling [state] interest" and to demonstrate "the absence of a less restrictive means to advance [that] interest." But when the law "interferes with an individual's freedom in an area that is not characterized as fundamental," we require the state to "show a legitimate interest and a close and substantial relationship between its interest and its chosen means of advancing that interest." [32]

Thus, the threshold question is whether the Huffmans are asserting a fundamental right. They argue that "there is no more fundamental right than that of a person to choose what substances will be taken or introduced into the body." [33] The State does not expressly dispute that claim, but it does emphasize the distinction between *Myers*, in which there was evidence that psychotropic medications could be harmful, and the Huffmans' case, which does not include such evidence.

■ In *Myers* we held that "[b]ecause psychotropic medication can have profound and lasting negative effects on a patient's mind and body, . . . statutory provisions permitting nonconsensual treatment with psychotropic medications implicate fundamental

liberty and privacy interests." [34] The potential harm to patients was not necessary to our analysis, however. We had already also held that the Alaska Constitution protects as fundamental rights the ability of every individual to control her hairstyle [35] and to make her own reproductive choices. [36] We believe controlling one's medical treatment falls into the same category of personal physical autonomy. We now hold that the right to make decisions about medical treatments for oneself or one's children is a fundamental liberty and privacy right in Alaska. [37]

Because we are considering a burden on a fundamental right, we next inquire whether the State has met "its substantial burden of establishing that the abridgment in question was justified by a compelling governmental interest." [38] The State contends that it has a compelling interest in preventing the spread of tuberculosis and believes that its goal outweighs the Huffmans' interest in avoiding the PPD skin test. The Huffmans do not appear to contest that a compelling interest exists, [39] instead focusing on whether the regulation uses the least restrictive means to achieve its objective. We believe that the State has a compelling interest in preventing schoolchildren from spreading tuberculosis. [40]

**32.** *Id.* at 245–46 (citing and quoting *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001); quoting *Ranney v. Whitewater Eng'g*, 122 P.3d 214, 222 (Alaska 2005)) (internal citations omitted) (alterations in *Myers* ).

**33.** The State does not dispute, or even discuss, the Huffmans' implicit assumption that this right extends to one's children.

**34.** *Myers*, 138 P.3d at 246.

**35.** *See Breese v. Smith*, 501 P.2d 159, 169–70 (Alaska 1972).

**36.** *See Valley Hosp. Ass'n v. Mat–Su Coalition for Choice*, 948 P.2d 963, 969 (Alaska 1997).

**37.** Some medical decisions, such as those concerning a minor's reproductive privacy, may implicate a child's own personal fundamental liberty and privacy interests. *See State v. Planned Parenthood of Alaska*, 35 P.3d 30, 40 (Alaska 2001) (recognizing that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority" and that reproductive decisions have " 'uniquely personal' physical, psychological, and economic implications" (quoting *Planned Parent-*

*hood of Central Mo. v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (internal quotation marks omitted) and citing *Valley Hosp. Ass'n*, 948 P.2d at 968)).

**38.** *Breese*, 501 P.2d at 171 (requiring also a showing that government action impaired the constitutionally protected interest).

**39.** The Huffmans' brief does appear to argue that the State does not have a compelling interest in ensuring that Stone and Elias in particular receive the PPD skin test, noting that the State allows exemptions to and delays in compliance with the regulation. The compelling interests we recognize in privacy cases, however, are not in restricting an individual's behavior but rather in accomplishing the general purpose of a law or regulation by its broad application. *See infra* note 40.

**40.** *Cf. Lawson v. Lawson*, 108 P.3d 883, 887 (Alaska 2005) ("We conclude that the state has a compelling interest in supporting children."); *Pratt v. Kirkpatrick*, 718 P.2d 962, 969 (Alaska 1986) (concluding the state has a compelling interest in enforcing securities regulation statutes, "[t]he primary purpose of [which] is to

The final step in a privacy analysis is to inquire whether the State has demonstrated that "no less restrictive means could advance" the compelling interest it has articulated.[41] The State has argued that "[t]esting for latent TB infection through a PPD skin test is the least restrictive means to achieve this interest because, at present, it is the only means available to test for that latent infection." The Huffmans claim, however, that 7 AAC 27.213 does not meet this standard, describing two alternative tuberculosis tests that do not require inserting any substance into the body. They first refer to the sputum test, which indicates the presence of an active tuberculosis infection. Because PPD skin tests, by contrast, reveal latent infections and can thus prevent exposure to other children before a tuberculosis-infected student becomes contagious, we are unsure if the sputum test achieves the purposes of 7 AAC 27.213. The Huffmans also discuss the QuantiFERON–TB Gold (QFT–G) test, which tests for latent tuberculosis infections in a blood sample taken from a patient. The QFT–G test, though approved by the federal Food and Drug Administration, is apparently not available in Alaska. The Huffmans express a willingness to travel with their children out of state to have it administered.

We do not have sufficient facts regarding the efficacy of the QFT–G test to rule on this question. The only information about the test in the record before us is a short fact sheet, available on the internet, from the Centers for Disease Control. We recognize that it is a less restrictive alternative from the perspective of the Huffmans but cannot say whether it falls importantly short of the goals achieved by administration of the PPD skin test. If it does, the superior court should consider evidence regarding other accommodations, such as annual sputum tests, to determine if they adequately meet the State's needs without unnecessarily infringing on the Huffmans' rights. If the QFT–G test or another type of test does not fail to

meet the State's goals, the superior court must conclude that the relevant test is an acceptable accommodation the Huffmans' children can use to fulfill the tuberculosis testing requirement for school attendance.

## V. CONCLUSION

We AFFIRM the superior court's grant of summary judgment to the State regarding the Huffmans' regulatory and religious freedom claims. We REVERSE and REMAND for consideration of less restrictive alternatives its grant of summary judgment to the State regarding the Huffmans' liberty and privacy claim.[42]

---

protect the unwary and unsophisticated members of the general public from deceit and fraud in securities transactions").

**41.** *Valley Hosp. Ass'n,* 948 P.2d at 969.

**42.** The Huffmans also challenge the award of partial attorney's fees the superior court entered against them pursuant to Civil Rule 82(b)(2) and AS 09.60.010(c). We see no error in the court's calculation but must vacate the award in light of the reversal on appeal.