*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-18662 |
| LILA B. | ) ) | Superior Court No. 3AN-23-00231 PR |
| | ) ) | O P I N I O N |
| | ) ) | No. 7763 – May 2, 2025 |
| | ) ) ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for Lila B. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

MAASSEN, Chief Justice.

## I.  INTRODUCTION

A woman with a severe head-lice infestation was detained at a psychiatric hospital while she awaited evaluation for a mental health commitment. The superior court issued an order authorizing hospital staff to shave the woman's head without her

consent. On appeal, the woman argues that involuntary head-shaving is a significant infringement upon a patient's fundamental rights and should require a heightened showing from the State.

We hold that before the State may shave the head of a nonconsenting patient in its care, it must demonstrate by clear and convincing evidence that head-shaving is the least restrictive means of advancing a compelling government interest. Because the State failed to meet that heightened standard in this case, we vacate the order authorizing the involuntary head-shaving.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

A police officer detained Lila B.[1] on an emergency basis for a mental health evaluation and transported her to a correctional center. Several days later the Department of Corrections petitioned for an order authorizing Lila's hospitalization for evaluation pursuant to AS 47.30.710. A superior court master issued the order, and after another three days Lila was transferred to the Alaska Psychiatric Institute (API) for evaluation.

API staff saw that Lila was suffering from a severe infestation of head lice, and they decided she should stay in the hospital admissions area until the infestation could be treated. Staff members encouraged her to let them apply a permethrin shampoo treatment to her hair, which was heavily matted. She responded that allowing them to touch or treat her hair would violate her religious beliefs, though she did not specify a belief system. After failing to secure her cooperation, API staff decided they would have to shave her head before she could be admitted to a hospital unit.

---

[1]    We use a pseudonym to protect the respondent's privacy.

**B.    Proceedings**

Shortly after Lila's arrival at API, counsel for the State requested an immediate hearing for authorization to shave her head.  At the hearing, the State presented testimony from two API health care providers:  Edward Czech, a registered nurse and the admissions screening manager, and Dr. Sean Farley, an advanced nurse practitioner and doctor of nursing practice.  Both witnesses testified that less invasive lice treatments, such as permethrin shampoo and isolation, would be inadequate under the circumstances.

Czech testified about API's typical lice treatment procedures, including a permethrin treatment or, "if necessary," a hair trim or head-shaving.  He explained that hospital staff might not be able to comb all of the nits, or lice eggs, out of the mats in Lila's hair, meaning that even after a permethrin treatment to kill active lice, "she would probably have another infestation in about nine days."  Moreover, the permethrin might not reach active lice that were embedded in the mats.

Czech acknowledged that API had had an isolation unit during the COVID-19 pandemic but said it had been "closed down" and was no longer available, and that isolating Lila in the admissions area instead would prevent the hospital from processing other newly arrived patients.  Dr. Farley, who was qualified as an expert in psychiatry, testified that isolating Lila in the admissions area would be stigmatizing and hamper her participation in therapeutic activities.  He explained that API staff had "tried things that would facilitate cooperation and be less intrusive than removal of her hair, up to and including providing preferred food items, providing preferred music, providing privacy, [and] providing gender specific employees to do interventions," none of which had been successful.  Both Czech and Dr. Farley expressed concern that the infestation could spread to other vulnerable patients.  Czech noted that a lice

infestation could lead to cellulitis, which "at its most extreme . . . can cause sepsis and death."[2]

Lila testified next, explaining her opposition to having her head shaved. She explained that her religious belief, "which is the Bible," forbade her from touching, cutting, and shaving her hair. She testified that her eczema caused a weeping infection on her scalp, "[s]o if they cut off my hair, I'm going to have to stare at myself in the mirror and remember this day . . . [a]nd I'm going to have to stare at my infection on my head, and it's going to be torture."

At the conclusion of the hearing, the master issued an order recommending that the superior court authorize an involuntary head-shaving. The master concluded that Lila's "important liberty interests in privacy and protecting her own appearance must be carefully weighed against the legislature's disfavoring of her isolation and confinement, as well as the safety of other patients and staff from the spread of lice and lice-borne disease."

Lila objected to the master's recommendation, but the superior court adopted it after an independent review of the evidence. First, the court found that API had a compelling interest in preventing the spread of lice to patients and employees. Next, the court found that shaving Lila's head was the least restrictive means of furthering this compelling interest because API could not effectively isolate her, and permethrin shampoo might not be able to penetrate the mats in her hair.

Once the State received the superior court's order, hospital staff shaved Lila's head. Ten days later she was released on a master's recommendation, adopted by the superior court, that she did not meet the statutory criteria for a 30-day involuntary commitment because she was not gravely disabled and was not likely to cause serious

---

[2] Cellulitis is a "diffuse and usu[ally] subcutaneous or intrapelvic spreading inflammation of connective tissue." *Cellulitis*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

harm to others and because the State had not shown there were no less restrictive alternatives to involuntary commitment.[3]

Lila appeals the order authorizing the involuntary shaving of her head.

## III.   STANDARD OF REVIEW

"We review factual findings in involuntary commitment proceedings for clear error."[4]  We defer "to a superior court's credibility determinations, particularly when they are based on oral testimony," and defer to the superior court's weighing of conflicting evidence.[5]  We apply our independent judgment to questions of statutory and constitutional interpretation, "adopting 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[6]  Specifically, we review de novo a superior court's decision that there was clear and convincing evidence that a state action was the least intrusive alternative available, even though the factual findings underlying that analysis are reviewed for clear error.[7]  Mootness is also a question of law that we review de novo.[8]

---

[3]      *See* AS 47.30.735(c).

[4]      *In re Hospitalization of Darren M.*, 426 P.3d 1021, 1027 (Alaska 2018).

[5]      *In re Hospitalization of Jacob S.*, 384 P.3d 758, 769 n.36 (Alaska 2016) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 930 (Alaska 2012)); *In re Hospitalization of Danielle B.*, 453 P.3d 200, 202-03 (Alaska 2019).

[6]      *In re Hospitalization of Naomi B.*, 435 P.3d 918, 924 (Alaska 2019) (quoting *In re Jacob S.*, 384 P.3d at 764).

[7]      *In re Hospitalization of Lucy G.*, 448 P.3d 868, 878 (Alaska 2019).

[8]      *In re Naomi B.*, 435 P.3d at 923.

## IV. DISCUSSION

### A. This Appeal Falls Within The Public Interest Exception To The Mootness Doctrine.

API staff shaved Lila's head in early 2023 upon the superior court's authorization, so this appeal is technically moot.[9] However, "we will hear an otherwise moot case where it falls under the public interest exception to mootness."[10] Lila contends that we should apply the public interest exception and consider the merits of the appeal. We agree.

The public interest exception to the mootness doctrine considers "three factors: '(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.' "[11] The State argues that Lila's appeal fails to meet the first and third factors because the disputed issues are highly "fact bound and individualized" and do not raise "broadly applicable legal questions." But Czech testified that API had treated patients with lice before and that staff members would shave a patient's head "if necessary." In the context of involuntary commitment appeals, we have held "that a case need not be capable of being repeated *identically* in order for the public interest exception to apply."[12] The fact that Lila's lice infestation was especially severe does not preclude application of the public interest exception to

---

**9** *See In re Jacob S.*, 384 P.3d at 770 ("[A] claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails." (alteration in original) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 839 (Alaska 2014))).

**10** *In re Naomi B.*, 435 P.3d at 927.

**11** *Id.* (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 380-81 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918).

**12** *Id.* at 928 (emphasis in original).

her case. And her case implicates fundamental liberty and privacy rights that are highly important to the public interest.[13] We therefore consider the merits of Lila's appeal.

**B.      It Was Error To Authorize The Involuntary Head-Shaving.**

Lila objects to the head-shaving order on the grounds that the State failed to prove both that it had a compelling interest in treating her lice infestation and that shaving her head was the least restrictive means of doing so. She also raises two additional substantive due process arguments: first, that the superior court erred by failing to determine whether Lila met the criteria for continued detention for evaluation before considering the State's request to shave her head; and second, that the involuntary head-shaving was not reasonably related to the purpose of her detention, which was a mental health evaluation.

We conclude that the State failed to meet its burden of demonstrating by clear and convincing evidence that shaving Lila's head was the least restrictive means of treating her lice infestation. Because we resolve the appeal on that ground, we do not reach Lila's other due process arguments.

**1.      The clear and convincing evidence standard governs the State's burden to show that shaving Lila's head was the least restrictive means of furthering a compelling state interest.**

The parties agree that shaving Lila's head against her will substantially burdened her fundamental rights and that the State was consequently required to demonstrate that the head-shaving was the least restrictive means of furthering a compelling state interest. Lila further asserts that the State was required to prove by clear and convincing evidence that other less restrictive alternatives — such as a

---

[13]      *Cf. id.* ("[W]e have repeatedly held that some issues in involuntary commitment appeals are important to the public interest — the third factor — because an involuntary commitment is a 'massive curtailment of liberty.' " (quoting *Wetherhorn*, 156 P.3d at 375)).

permethrin shampoo treatment, isolation, or wearing a shower cap — were infeasible or inadequate.

What evidentiary burden applies in this context is a question of first impression. We have previously held that "the right 'to be let alone' [—] including the right to determine one's own hairstyle in accordance with individual preferences and without the interference of governmental officials or agents [—] is [a] fundamental right under the constitution of Alaska."[14] Hairstyle is an important component of identity and self-expression. An individual may wear hair of a certain style or length as an expression of gender identity, religious practice, or culture.[15] During an involuntary commitment, which is a "massive curtailment of liberty,"[16] hairstyle may be one of the few means of self-expression the patient has left.

We have also recognized "that 'the right to make decisions about medical treatments for oneself . . . is a fundamental liberty and privacy right' under the Alaska Constitution."[17] This right must extend equally to persons experiencing mental health crises so that they "are not treated 'as persons of lesser status or dignity because of their illness.' "[18] When the State seeks to involuntarily commit a patient, the reviewing court

---

[14] *Breese v. Smith*, 501 P.2d 159, 171 (Alaska 1972).

[15] *See, e.g.*, *Monroe v. Meeks*, 584 F. Supp. 3d 643, 648 (S.D. Ill. 2022) (observing that wearing particular hairstyle can affirm one's gender identity); *Singh v. Berger*, 56 F.4th 88, 91 (D.C. Cir. 2022) ("[Appellants] are members of the Sikh faith, which requires them, as relevant here, to maintain unshorn hair and beards and to wear certain articles of faith."); *Ware v. La. Dep't of Corr.*, 866 F.3d 263, 266 (5th Cir. 2017) (involving inmate's vow not to cut or style hair as exercise of Rastafari religious faith).

[16] *In re Naomi B.*, 435 P.3d at 928 (quoting *Wetherhorn*, 156 P.3d at 375)).

[17] *In re Protective Proceedings of Nora D.*, 485 P.3d 1058, 1066 (Alaska 2021) (alteration in original) (quoting *Huffman v. State*, 204 P.3d 339, 346 (Alaska 2009)).

[18] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006) (quoting *Rivers v. Katz*, 495 N.E.2d 337, 341 (N.Y. 1986)).

"must determine that clear and convincing evidence shows [that] no feasible less restrictive alternative to involuntary commitment exists."[19] Because shaving a patient's head without consent intrudes upon fundamental liberty and privacy rights, we will apply this same standard in the case of an involuntary head-shaving.

Involuntary head-shaving implicates both a patient's fundamental right to control her appearance and her fundamental right to make decisions regarding medical treatment. For patients with religious objections to hair-cutting and shaving, it may also implicate free exercise rights.[20] Lila testified that viewing her shaved scalp in the mirror would be "torture." For Lila, who was detained for evaluation but did not ultimately meet the criteria for involuntary commitment, the highly visible effects of the head-shaving lasted long after her release from state custody. Before imposing such a substantial burden on a patient's fundamental rights, it is imperative that the State meet a heightened evidentiary standard. For this narrow context, we therefore adopt the clear and convincing evidence standard.

### 2. The State had a compelling interest in protecting API patients and staff members.

Having clarified the burden on the State, we next determine whether the State demonstrated a compelling interest in treating Lila's lice infestation. We conclude that it did.

Lila concedes that "[t]he state certainly has an interest in protecting the health of other vulnerable patients in its custody" but argues that this interest is not compelling as to lice because lice do not present a public health hazard. She asserts

---

[19]   *In re Hospitalization of Sergio F.*, 529 P.3d 74, 78 (Alaska 2023).

[20]   The parties agree that the head-shaving substantially burdened Lila's fundamental liberty and privacy rights. We do not decide whether Lila's testimony regarding her religious belief established a violation of her free exercise rights. *See Huffman*, 204 P.3d at 344-45 (describing threshold requirements of free exercise claim under Alaska Constitution).

that the State failed to present evidence that there was a high risk of lice transmission from herself to others or that the lice posed a direct danger to other patients or staff. But the State indubitably has, in most circumstances, a compelling interest in "protecting the life, health, and safety of . . . vulnerable groups."[21] The superior court found that "[t]ransmission of lice could adversely affect the health of patients and staff" because lice "bite their hosts and [could] cause cellulitis and other infections," and that "[o]ther patients [at API] who are unable to attend to their own hygiene are particularly at risk for untreated infections." These findings of fact are supported by the testimony of API's witnesses, and they are not clearly erroneous. The superior court did not err in concluding that the State had a compelling interest in preventing the spread of lice to API patients and staff.

> **3.** **The State did not demonstrate by clear and convincing evidence that shaving Lila's head was the least restrictive means of protecting patients and staff.**

We next determine whether the State demonstrated by clear and convincing evidence that shaving Lila's head was the least restrictive means of furthering the State's compelling interest in preventing the spread of lice to API patients and staff while evaluating Lila's mental health. As noted above, although we review the superior court's underlying factual findings for clear error, we use the "exacting de novo review standard" when deciding whether the evidence related to the least restrictive means is clear and convincing, as we are measuring that evidence against the important constitutional principles of individual liberty.[22]

Lila argues both that the State failed to prove the inadequacy of the two treatments discussed at the hearing — permethrin shampoo treatment and isolation —

---

[21] *In re Protective Proceedings of Tiffany O.*, 467 P.3d 1076, 1082 (Alaska 2020).

[22] *In re Hospitalization of Lucy G.*, 448 P.3d 868, 878 (Alaska 2019).

and that the State had an obligation to explore other alternatives. First, she asserts that because Czech had not been qualified as an expert in shampoo treatment, the court should not have relied solely on his statements regarding the treatment's efficacy to conclude that it was not a feasible alternative. Second, she argues that isolation in a separate room, the admissions area, or the closed COVID-19 isolation unit would have been sufficient to protect API patients and staff from lice transmission. Finally, she presents other alternatives, such as requiring her to wear a shower cap or evaluating her on an outpatient basis, which she contends the State should have considered. The State argues in response that the record was sufficient to demonstrate the inadequacy of the other alternatives Lila raises on appeal.

The clear and convincing evidence standard places a "substantial burden" on the State.[23] Although the State is not required to "prove the unavailability of every imaginable alternative," it must explore less restrictive alternatives and demonstrate why they are inadequate.[24] We have clarified that "any proposed alternative 'must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action.' "[25]

We conclude that the evidence before the superior court did not clearly and convincingly establish that shaving Lila's head was the least restrictive way to accommodate the State's legitimate concerns. The court relied on Czech's testimony that a permethrin treatment "may miss" any active lice that were embedded in Lila's hair mats, but the court also acknowledged that "[i]f shampoo alone would kill the active lice, the court would not conclude that API's proposed treatment was least

---

[23]     *In re Sergio F.*, 529 P.3d at 80.

[24]     *Id.* (quoting *In re Hospitalization of Vern H.*, 486 P.3d 1123, 1131 n.31 (Alaska 2021)).

[25]     *In re Lucy G.*, 448 P.3d at 882 (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009)).

restrictive." Czech testified that a permethrin treatment "should kill the active lice immediately" and "should be good for approximately 10 days" before another infestation, from a new hatch of nits, could take hold. Lila's authorized detention at this stage was only 72 hours. Even assuming that nits would begin to hatch during that 72-hour period, Czech did not testify that hospital staff could not reapply a permethrin treatment during that time. And even if permethrin alone would not have killed all active lice, the State's evidence did not establish that using a permethrin treatment in conjunction with a head covering or some measure of physical isolation would have been ineffective to further the government's compelling interest in preventing the spread of lice.

Relying on Czech's testimony, the superior court further found that "API is unable to effectively isolate [Lila]." Czech's testimony established that API would be unable to accommodate "true isolation" as was necessary during the COVID-19 pandemic. However, his testimony failed to demonstrate, by clear and convincing evidence, that API could not segregate Lila from other patients in such a way as to prevent the transmission of lice. A less strict form of isolation could have furthered the State's compelling interest, particularly if API staff first applied a permethrin treatment to reduce the severity of the lice infestation. In short, we do not read Czech's testimony as providing clear and convincing evidence that no combination of permethrin, head-covering, and reasonable limitations on contact with others could have advanced the State's compelling interest in protecting patients and staff from transmission during the period of Lila's detention.

Because these alternatives were not sufficiently explored, we conclude that the State did not meet its substantial evidentiary burden to show by clear and convincing evidence that less restrictive alternatives were unavailable or infeasible. Authorizing the involuntary head-shaving was therefore error.

## V.	CONCLUSION

We VACATE the superior court's order authorizing the involuntary shaving of Lila's head.