WINFREE, Justice,
dissenting.
I respectfully disagree with today's decision affirming the superior court's denial of Jolene Lyon's motion to modify her child support 'obligatioti. ' In my view: (1) it was clearly erroneous to find Jolene's move to Stebbins unreasonable; (2) it was legal error to conflate the reasonableness of Jolene's relocation to Stebbins with the reasonableness of her unemployment in Stebbins; (@) there was an insufficient factual basis to support a finding that Jolene was unreasonably unemployed in Stebbins; (4) it was an abuse of discretion not to consider all the required factors when determining whether, Jolene is unreasonably unemployed; and (5) it was clearly erroneous to determine that Jolene could reasonably continue to earn $120,000 annually, whether in Anchorage or in Steb-bins.[1] The reasons behind Jolene's move to Stebbins are far more compelling-certainly not less compelling-than parental moves found reasonable in prior cases, and in those prior cases the parent's imputed income, if any, was determined by 'employment opportunities in the new location, not the old location. Accordingly the superior court should have focused on Jolene's employment opportunities in Stebbins. -I would remand for further proceedings to determine whether Jolene is unreasonably unemployed based on her overall cireumstances in Stebbins, taking into account Jolene's Free Exercise argument.
Alaska Civil Rule 90.3(a)(4) permits a court to impute income when a parent "voluntarily and unreasonably is unemployed or underemployed." In deciding whether a parent is unreasonably unemployed, the court must evaluate all of the parent's cireumstances.[2] If the court decides to impute income to a parent, the rule requires the court to consider "the parent's work history, qualifications, and job opportunities," as well as potential income from existing assets.[3] Child Support Services Division (CSSD) regulations about voluntary and unreasonable unemployment echo Rule 90.8(a)(4)[4] but more specifically require CSSD to consider "the parent's ... job opportunities in the area where the parent physically resides" when determining *77 imputed income.[5] The regulations also provide that "if a parent makes a career change, the agency will consider the extent to which the children will ultimately benefit from the change." [6] Additionally CSSD permits a parent to request that an order to withhold and deliver be modified based on hardship when the obligor parent "lives a subsistence life style without any local opportunity for employment." [7]
Rule 90.3(a)(4) says nothing about considering the reasonableness of a parent's decision to relocate, nor do CSSD's regulations.[8] But our case law reflects that the reasonableness of a move is considered separately from the reasonableness of unemployment, and that onee a relocation: decision is determined legitimate-i.e., reasonable-the parent's imputed or actual income is evaluated in the context of the new location, not the old location.[9] This case law is consistent with the CSSD regulation, noted above, requiring consideration of imputed income in the economy "where the parent physically resides." [10]
In Richardson v, Kohlin we addressed child support modification when a non-custodial father relocated outside of Alaska and the mother requested imputation of income based on the father's previous Alaska income.[11] The father was an Anchorage union worker who decided to move- to the Pacific Northwest to be closer to his and his new wife's families and to avoid continual custody disputes with the mother.[12] The mother argued that the father's move "was ill-considered and impulsive" and that their child would suffer from the move because of diminished support.[13] The superior court found the reasons for the father's move legitimate; found potential benefits to the child, including "the opportunity to better know her extended family" and the possibility. of diminished conflict between her parents; and determined that it would be inappropriate to impute income.[14]
On appeal we affirmed the superior court's factual finding that the father's move was for a. legitimate purpose.[15] We then considered whether the court "abused its discretion" in "finding" that the father's underemployment was reasonable.[16] We upheld the court's finding that, in light of the father's efforts to find work, his full-time employment, and his active pursuit of higher-paying work, the fa *78 ther's "underemployment" was reasonable.[17] Although our Richardson opinion is not particularly clear, I understand the ultimate ruling to be that; - (1) because the move was legitimate, there was no basis to impute income based on the father's prior Alaska income level, and (2) because the father was making reasonable efforts to find appropriate work in his new location, there was no basis to impute income based on income levels at | the new location.
In Petrilly v. Petrillo parents were in a joint custody arrangement until the father decided to relocate to Nevada with his new wife and daughter to be closer to his parents, oné of whom was terminally ill, in Arizona.[18] The father quit his job as a juvenile probation officer with the State of Alaska and for some time received unemployment benefits while looking for similar work in Nevada.[19] The mother moved to modify eustody and support before the father's move, and after the move requested that the court impute income to him based on his Alaska income.[20] The father agreed the mother should have sole legal and primary physical custody of their child, but disagreed with the mother's contention that his child support payment should be based on his former Alaska income.[21] The superior court rejected the mother's argument that the father's support obligation should be based solely on his prior Alaska income-appearing to state that it could not find the move itself to be voluntary underemployment-and based the obligation on his Alaska income during the time he actually worked for the State, then on his unemployment benefit income for five months, and thereafter on what, he could reasonably earn if he obtained a juvenile probation officer position with the State of Nevada.[22] The father then filed a new motion to modify the court's final calculation of his child support obligation, asserting that he had obtained a job with the State of Nevada as a family services specialist and that his income would be around $33,000 rather than the nearly $44,500 figure the court had imputed to him as a Nevada juvenile probation officer.[23] The court. denied the motion.[24]
On appeal we concluded that the superior court had not provided a sufficient factual - basis to support its denial of the father's ° modification motion,[25] specifically noting that the court "made no express finding that [the father] was capable of earning more than his new job paid, that higher-paying jobs were available to [the father] in Nevada, or that [the father] took a position paying less than what was available.[26] We also stated: "IT Ihe record before us does not reflect the availability of employment opportunities in Nevada that would have paid [the father] more than the position he secured."[27] Rejecting the court's position that the father "may have to work one or two.jobs" to meet his imputed income level, we remanded for more detailed findings. [28] Now to the facts of this case, Jolene is half Yup'ik Eskimo, and her tribal affiliation is with. Stebbins Community Association. Jolene's Yupik mother was born and raised in Stebbins, about 120 miles from Nome. Jolene was born in' Anchorage but raised in Stebbins and Nome. Jyzyk is an Alaska Native from the Kotzebue area, although the record does not reflect a tribal affiliation.
Now to the facts of this case, Jolene is half Yup'ik Eskimo, and her tribal affiliation is with. Stebbins Community Association. Jolene's Yupik mother was born and raised in Stebbins, about 120 miles from Nome. Jolene was born in' Anchorage but raised in Stebbins and Nome. Jyzyk is an Alaska Native from the Kotzebue area, although the record does not reflect a tribal affiliation.
< Jolene and Jyzyk married in' December 2002 in Nome. Their daughter was born in Anchorage in June 2002. She is an enrolled tribal member of Stebbins Community Association. C not
*79 Jyzyk filed for divorcee in August 2011, In September Jolene and Jyzyk stipulated to equal shared custody, with the parties alternating custody on a weekly basis but limiting their contact to writings only. Based primarily on her roughly $120,000 annual salary at Alyeska Pipeline Service Company, Jolene was ordered to pay Jyzyk approximately $885 monthly as interim child support. -
The record is clear that Jolene and Jyzyk's post-separation relationship was contentious from the start, Soon after their stipulated order barring non-written communication and expressly barring each from the other's residence, Jolene moved (unsuccessfully) to bifurcate the proceedings with the early entry of a divoree decree, stating that the post-separation period was "fairly volatile" and that she and Jyzyk could "reap psychological benefits and a calming effect" from the early decree. Both before and after the divorcee trial the parties engaged in mutual motion practice for orders to show cause and sane-tions. (
In February 2012 the court entered a new preliminary and then a final interim custody modification order giving Jyzyk primary physical custody of their daughter, restricting Jolene to limited supervised visitation, and directing that Jolene's support obligation be modified accordingly. This change arose from an alcohol-related incident of violence at Jolene's residence while the then nine-year-old daughter was present. Jyzyk contended that Jolene began drinking heavily in early 2010; according to other documents in the record, this was a few months after Jolene began working for Alyeska. As part of the court's final interim order, Jolene and Jyzyk were each ordered to "undergo an alcohol assessment."
By the time of the July 2012 divorce trial Jolene had undergone her required aleohol assessment. Jyzyk successfully argued at trial for sole legal custody of their daughter because of conflict and inability to communicate with Jolene. Jolene was granted continued supervised visitation consistent with the final February interim order. The court ordered that when Jolene completed the ree-ommendations associated with her aleohol assessment, the requirement that visitation be supervised would be lifted. Of final note with respect to child custody, the court ree-ognized Jyzyk's concerns-and expressed its own-about Jolene's boyfriend, B.J., a childhood friend of hers from Stebbins with whom she reconnected in 2011. B.J. was one of the persons involved -in the February aleohol-related incident, but the court-ordered that B.J.'s "presence in [Jolene's] life would not preclude [Jolene's] receipt of unsupervised visitation." At the conclusion of the divorce proceedings Jolene was ordered to pay $1,507 monthly in child support.
Also relevant to the issue before us is a small portion of the superior court's property division at the time of divorcee. The court first recognized that Jolene had a non-marital interest in her mother's restricted Native allotment property in the Nome area. The court next. ordered that Jolene and, Jyzyk would "continue to co-own, [as] joint tenants in common, a Nome-area lot" to be held or disposed of by mutual agreement.
'The superior court's decision was issued in late July. In mid-August Joléne submitted a certificate of completion for her out-patient aleohol treatment program. She sought, but Jyzyk opposed, implementation of an unsupervised visitation schedule." At an early November-"evidentiary hearing the court approved a visitation agreement reached by the parties, including a provision that Jolene not have unsupervised visitation with B.J. present until B.J. submitted his own certification from an alcohol treatment program. BJ's certificate of completion of an out-patient treatment program was filed a week later.
In February 2018 Jolene and B.J. had a son. In late April Jolene, B.J., and their son moved to Stebbins, where they lived together in a small four-plex apartment. B.J. began working in Stebbins to support the family, while Jolene stayed home with their son and immersed herself in Yupik cultural and religious activities and a subsistence lifestyle.
Contending that her new child and relocation to Stebbins constituted a change of circumstances warranting modification of her child support obligation, Jolene moved to reduce her child support to the minimum $50 *80 monthly payment.[29] Jyzyk opposed the motion, arguing that Jolene was voluntarily and unreasonably unemployed, that she should not have quit her Anchorage job with Alyes-ka, and that her child support obligation should remain unchanged. Jolene replied that she had "made a cultural, religions and spiritual decision to move to her home village of Stebbins'"-a decision "she had always intended to make when the opportunity presented itself"-and that a modification of child support was warranted.
The superior court ordered a hearing, expressly recognizing the religious underpinning of Jolene's modification motion by quoting her reply memorandum statement that her decision to move to Stebbins was "cultural, religious and spiritual." The court noted that Jolene conceded her unemployment was voluntary, and that it therefore had to determine whether Jolene's unemployment was unreasonable and, if so, whether it should impute irfcome to her when determunng her child support obligation. «
At the hearing Jolene testified at some length about her cultural, religions, and spiritual ties to Stebbins. As noted above, Jolene's mother is a Yup ik Eskimo born and raised in Stebbins; Jolene is half Yupik Eskimo and was raised in Nome and Stebbins. Like. Jolene, her daughter is an enrolled tribal member of Stebbins Community Asso-clation,. - B.J, also is from Stebbins, and Jo-lenge and B.J. want their son to grow up in the village and "know[] where he comes from and who his people are." - Jolene always dreamed of living in the area, and she and Jyzyk had purchased the lot in Nome with that intent. Jolene stated that her "roots" brought her back to Stebbins and that Steb-bins "is the cornerstone of. [her] spiritual connection, [her] cultural connection, [and -her subsistence lifestyle." - Her "family history[1 and [her] relatives [are] all from [Stebbins]." Jolene reconnected with these roots in 2004 when she brought her daughter there and participated in her "first traditional dance with [her] daughter, [her] mom, and [her] brother and hlS son” and returned m later years for the "yuraq" (Eskimo dancing) and Yupik Eskimo lifestyle. Jolene wanted ber daughter to be brought up in Alaska Native culture and experience village life.
After relocating, Jolene became "completely immersed in the subsistence lifestyle [in Stebbins]" and participated in Eskimo dane ing as much as she could, Jolene. "learned that Eskimo dancing was-traditionally before Christianity came [to Stebbins]l-was [the Yupik Eskimo] religion" and she has "found that Eskimo dancing is very, very spiritual and healing in making a connection with our [Yupik Eiskimol ancestors Steb-bins is a "dry" community, also one of the main reasons she left Anchorage for Steb-bins. In terms of dealing with sobriety, she was "so much ... happier" living the subsistence lifestyle in Stebbins, and she found life in Stebbins "spiritually healing.". Jolene also explained that to "fully embrace" the spiritual aspects of Eskimo dancing and to participate fully in subsistence activities, it was important to live in her village.
- During its own questioning of Jolene, the superior court stated: "I've heard your testimony and I don't question ... your sincerity and ... the value you place in reconnecting with [your] ... Native and historical cultural . roots...." But when it came time to determine whether Jolene's move to Stebbins was for a legitimate purpose, the court characterized her decision as only "admirable in an abstract sense," "essentially taking a retreat from reality," and "a lovely dream." The court posited the following hypothetical:
[Ilf we change the facts in this case, just hypothetically, and I had a person who-non-Indian, non-Native, but had decided that-one of the obligor parents had decided they wanted to join an ashram in India 'because it reawakened them spiritually and reconnected them and they wanted to go to a mountainous retreat, live a basic normal lifestyle and do this, and essentially withdraw from providing financial support, I would have a hard time in that hypotheti *81 cal situation simply approving it, and I have the same difficulty in this case. -
This hypothetical and the court's other unfortunate comparisons to joining a monastery or going to a "Tibetan retreat" serve. only to trivialize Alaska Natives' way of life, . Contrary to the superior court's analogy, Alaska Natives' cultural, religious, and spiritual connection to their tribes, their lands, and their subsistence activities are a normal way of life, not an escape From normal life. Our legislature has recognized the spiritual nature of subsistence living,[30] and we likewise have recognized the importance, of subsistence activities to Alaska Native cultural and social identity.[31] We applied the Free Exercise Clause [32] in Frank v. State to exempt the taking of moose for Athabaskan funeral pot-latches from State game regulations.[33] Most recently, in Phillip v. State the court of appeals evaluated a Free Exercise claim related to subsistence fishing, where the fishers asserted that "according to traditional Yup'ik belief, Ellam Yua is the spirit of the universe, consisting of all things tn a state of interconnectedness. - Ellam Yua provides the Yupik with the resources they need to survive, and the Yupik are expected to work hard to harvest those resources." [34] The court of appeals ultimately decided that the State's compelling interest in ensuring a healthy Kuskokwim River king salmon run outweighed the Yup'ik subsxstence ﬁshers reli-glous rights.[35]
The fundamental flaw in the superior court's analysis is its conflation of the legitimacy of Jolene's move with the reasonableness of her unemployment in Stebbins and the manner in which the court imputed income to Jolene: "[Tlhe choice that I'm presented with is between treating [Jolene] as having zero income or ... having imputed to her the income that she had at Alyeska. .. ." This was a false choice. The questions that should have been posed and answered at the hearing were: (1) whether Jolene's move to Stebbins was for legitimate reasons; (2) whether Jolene was in fact unreasonably unemployed in Stebbins; and if so, (8) what level of income should have been imputed to Jolene based on her work history, her qualifications, and her Job opportumtles in Steb-bins.[36]
*82 The court found that Jolene's decision to leave her employment in Anchorage and relocate to Stebbins to reconnect with her cultural roots was unreasonable because Jolene had not "established that her situation in Anchorage was destructive or adverse to her" given that there was no evidence "that she suffered from mental illness or from some sort of emotional state or psychological state that she needed to leave the urban setting, that she needed medically or psychologically or spiritually to leave Anchorage." But we never have required relocating parents to show that their prior locations were destructive to them or that they suffered from psychological conditions or mental illnesses to justify their relocation. Moreover the court's statements are at odds with its earlier custody decisions favoring Jyzyk based on Jolene's alcohol issues and with the evidence that Jolene's alcohol issues began shortly after she'started working for Alyes-ka.[37] To the extent the court today silently approves the superior court's reliance on "no destructive situation" and "no mental illness" factors to decide that a relocation is not legitimate, I strongly disagree.
In my view, even without considering Jolene's express Free Exercise claim raised on appeal, her relocation to Stebbins was legitimate-to the extent the superior court made a factual finding that Jolene's move to Steb-bins was not legitimate, that finding is clearly erroneous. No evidence in the record suggests that Jolene's relocation to Stebbins was for the purpose of decreasing her child support obligation. The court told Jolene it had "heard [her] testimony and ... [did not] question ... [her] sincerity and ... the value [she] place{d] in reconnecting with [her] .. cultural ... roots...." The court also found, that both Jolene and her daughter derived some benefit from Jolene's move to Stebbins, and Jyzyk agreed that Jolene benefitted to some extent from the move.
Our case law is clear that moves outside of Alaska to be near other family members and to decrease conflict over custody issues are legitimate for purposes of modifying child support.[38] How can it not be legitimate for an Alaska Native living in an urban center and having difficulty with sobriety to relocate to her own dry tribal “ﬂags where she has family, cultural, religious, and spiritual roots; where she can more easily maintain sobriety; where she has property interests; where she can raise her children in their tribal culture; and where, incidentally, she can reduce conflict with her former spouse over custody and visitation issues? Our case law also is clear that children may benefit from, being exposed to extended family members and decreased custodial conflict between parents.[39] How would Alaska Native children not similarly benefit from living, even part of the time, in their own tribal villages with extended family members, and from the ensuing decreased custodial conflict between parents? Under the circumstances in Richardson and Petrilla the decisions to relocate were legitimate; given Jolene's cireumstances, I simply cannot fathom how her move to Stebbins is any less legitimate.
The court relegates the reasonableness of Jolene's move to one of the factors in the totality of cireumstances test used to determine how much income should be imputed. But the cases actually discussed by the court provide little support for its position. In Pattee v. Pattee we adopted the totality of the cireumstances test to determine whether child support should be reduced automatically after a voluntary reduction in income.[40] *83 We reversed the superior court's decision setting a reduced rate because there was insufficient evidence about the parent's career change, and remanded for further findings.[41] Key to our decision was our determination that the parent had fraudulently conveyed an income-producing asset and was receiving rent-free housing, a monthly allowance, and tuition assistance from family members[42] We made two statements in Pattee relevant here: "we do not believe that an obligor-parent should be 'locked in' to a particular job or field during the minori« ty of [the] children when accepting a lower-paying position may ultimately result in personal or professional advancement"; and "the children of the marriage and the custodial parent should not be forced to finance the noncustodial parent's career change." [43] And we quoted a Montana case directing courts to "consider. the nature of the changes and the reasons for the changes" before deciding "whether, under all the circumstances, a modification is warranted." [44]
The court says that Pattee's statement about not locking a parent into a specific job or career does not apply here because "a career change must be supported by a 'lower-paying position' that will 'ultimately result in personal or professional advancement. " [45] But the father in Pattee did not have a lower-paying position; his family was supporting him (and apparently helping him defraud his former wife) and he had no stated plans after attending community college.[46] There was considerable evidence that the father willfully was trying to minimize his property and income to avoid paying child support, suggesting illegitimacy of purpose.[47] We nonetheless adopted a balancing test, indicating that a court must consider not just the financial impact on the family, but also the reasons for and goals of a lifestyle change. But under the court's analysis today, there would have been no need to remand for further findings in Pattee-the order simply would have been reversed with instructions to reinstitite the original support obligation. "
Pugil v. Cogar involved a parent who had worked. as a commercial fisher and welder but asked the' court to set his child support obligation using estimated wages he could earn as a welder in Texas, where he had moved and planned to go to school.[48] The superior court set his child support obligation based on a several-year average of his commercial fishing income.[49] 'We affirmed, noting that the superior court had considered all relevant factors and that the parent "could both pursue his education and meet his [support] obligation ... by 'commercial fishing during one quarter of the year." [50] In short, we recognized that because of the 'seasonal nature of commercial fishing in Alaska, the parent could meet his stipport obligation without completely disrupting his life change. Pugil does not translate to this case: 'Jolene cannot change her life if her support obli *84 gation continues to be based not on her life in Stebbins, but solely on one specific full-time job in Anchorage-a job that she no longer has and that the superior court could only speculate she could regain if she returned to Anchorage.
. In Olmstead v. Ziegler both parents were lawyers; the father later downsized his practice to become a teacher and sought a reduced support obligation (not based on teaching salaries. but based solely on his reduced income as an attorney).[51] The superior court decided that the parents had equal earning capacities as lawyers and that the father failed to support his contention "that he was simply a failure at law."[52] We affirmed, adding that the father had not "prove[d] any benefit to the child from his decision to downsize his practice and change careers." [53] In contrast, it cannot be disputed that Jolene stated a cogent and legitimate rationale for her move to Stebbins and that her move and life change have benefits for her daughter.
In Sawicki v. Haxby [54] the superior court refused to reduce a mother's support obligation when she quit her first job after moving to Indiana and took a new job paying half as much[55] We affirmed, stating that the superior court had considered. the mother's "work history, prior income, qualifications, education, and reasons for leaving her job" and identifying other "potentially relevant" factors-the temporary nature of her reduced income and substantial assets available 'to her to meet her. obligation while awaiting advancement.[56] The superior court did not impute income to the mother at the maximum amount she had previously earned in Alaska, but rather determined she realistically was capable of earning the amount from her most recent job in Indiana.[57] In contrast, here the superior court did not consider the Rule 90.8(a)(d) factors for Jolene's earning capacity in Stebbins, or even Anchorage-it simply decided that because Jolene once earned $120,000 in Anchorage, her support obligation should be based on that salary-despite having no evidence of what she could earn in Stebbins or if she could regain the Alyeska job if she returned to Anchorage, .
Absent an legitimate motive, we have not previously, even indirectly, penalized a parent for moving from one geographical area to another.[58] Nor should we, for doing so certainly would implicate constitutional concerns.[59] And the goal of setting support is to "arrive at an income figure reflective of economic reality," [60] not maximum possible earnings: "Nothing in our law compels a party to earn the maximum possible wage or face imputation [of income]." [61]
Today's decision not only flies in the face of these considerations, it suggests that when setting a child support obligation neither a Native Alaskan's return to her village nor a traditional Native Alaska subsistence lifestyle has a valid role, The court's decision means that onee a non-custodial Native Alaska parent participates in the cash economy of urban Alaska that parent may be unable to voluntarily return to a rural tribal community and live either a local cash-economy lifestyle, a culturally and religiously based subsistence, non-cash, lifestyle, or *85 even something in between. And as a more general matter, why should a parent with primary physical custody have an absolute right to change careers, take a lower-paying job, or quit work altogether-perhaps even have the right to move to another geographic location with the children [62]-while a noncustodial parent with a child support obligation does not have those rights even if the actions are legitimate and provide benefits to the child? Why do we "take seriously" an alleged infringement only on a custodial parent's right to relocate, but not a non-custodial parent's right to relocate? [63] In my view a court has no right to effectively order where a non-custodial parent must live and what specific job that parent must hold.
The superior court disregarded the sparse evidence it had regarding the Stebbins economy without asking for more,[64] and completely ignored the question of what Jolene could reasonably earn in Anchorage considering all of the relevant factors,[65] including that she had only a high school education and no longer worked for Alyeska. The court focused exclusively on Jolene's former employment and framed the issue as a "black and white" choice between setting support at $50 monthly or leaving child support at the high amount set in the decree based on her former Alyeska job in Anchorage. But the court acknowledged 'that Jolene might have to live in Anchorage to work at her former job at - Alyeska, and could only speculate whether she could return to her old job even if she moved back to Anchorage. Even assuming the court could properly impute income to Jolene based on -what she might reasonably earn in Anchorage, the court, failed to require evidence regarding Rule 90.8(a)(4¢)'s imputation factors-including the fact that Jolene no longer works for Alyeska,. I would remand to .the superior court for further proceedings on this issue, as we did in Horne v. Touhakis[66] and Petrilla,[67] because the record does not provide a sufficient basis for determining whether Jolene is employable in Stebbins (or Anchorage) and, if so, how much income should be imputed to her considering all of the required factors.[68] The court should also take into account Jolene's Free Exercise claim." [69]
Today's decision has enormous negative implications. - It trivializes and devalues Alaska Natives' cultural, spiritual, and reli *86 gious connections to their villages and their subsistence lifestyle.[70] It requires a noncustodial Native parent in rural Alaska to pay child support based on what the parent could earn in urban Alaska regardless of the legitimacy of choosing to live in rural Alaska,[71] effectively requiring a parent in a rural area to move to an. urban area' to maximize income and child support. And finally, it infringes on constitutionally protected religious and privacy rights.
I dissent.

. 'I believe the standards of review applicable to this case are 'as follows: Whether a substantial change of circumstances has occurred to allow consideration of child support modification is a question of law, See Bagby v. Bagby, 250 P.3d 1127, 1128 (Alaska 2011); see also Alaska R. Civ. P. 90.3(b)(1) (allowing modification of child support "upon a showing of a material change of circumstances" and setting presumption of a material change of circumstances if new financial situation would lead to more than a 15% change in support). Whether a parent's relocation is for a legitimate reason is a question of fact reviewed for clear error. Cf. Richardson v. Kohlin, 175 P.3d 43, 49-50 (Alaska 2008) (affirming factual finding that father's move was for legitimate purpose). Whether a parent is voluntarily and unreasonably unemployed are questions of fact reviewed for clear error. See Reilly v. Northrop, 314 P.3d 1206, 1212, 1216 (Alaska 2013) ('The factual findings ... that [the father] was voluntarily and unreasonably underemployed are supported by the record and are not clearly erroneous."). Courts have broad discretion in deciding whether to modify child support and whether to impute income, see id. at 1212, but "[slufficent factual findings are required for imputing ... or declining to impute income." Richardson,. 175 P.3d at 48. The calculation of imputed income is a question of fact reviewed for clear error, Reilly, 314 P.3d at 1212 & n. 7.

. See Sawicki v. Haxby, 186 P.3d 546, 550 (Alaska 2008) (citirig Alaska R. Civ. P. 90.3 cmt. III.C). .

. Alaska R. Civ. P.90.3(a)(4); O'Connell v. Christenson, 75 P.3d 1037, 1041 (Alaska 2003). See also Horne v. Touhakis, 356 P.3d 280, 284 (Alaska 2015) (noting lack of specific findings to support income imputation order and directing superior court to make findings on ("the four factors enumerated in Rule 90.3(a)(4))"); Gonzalez v. Bernal, No. S-12784, 2009 WL 1039846, at "2 (Alaska Apr. 15, 2009) (reversing superior court order imputing income to parent because court did not make "a more specific inquiry into her actual present ability to earn" the amount of imputed income).

. 150 Alaska - Administrative Code (AAC) 125.060(a) (2013).

. 15 AAC 125.020(b) (emphasxs added)

. 15 AAC 125.060(c); decord Alaska R. Civ. P. 90.3 emt. IIIC; see also Richardson, 175 P.3d at 49 (chscussmg superior court's findings regarding parent's move outside of Alaska and potential benefits for chlld desplte 40% décrease in child support).

. 15 AAC 125.550(@), (b)(3) (emphasis added).

. See Alaska R. Civ. P. 90.3(a)(4d); 15 AAC 125.010-.900 (2015).

. See Petrilla v. Petrilla, 305 P.3d 302, 307-08 (Alaska 2013) (focusing upon availability of employment for father in new location when deter; mining whether income could be imputed to him); Richardson, 175 P.3d at 49-50 (affirming , child support modification order based on lower income in new location). In the analogous context of child custody modification due to a par- ~ ent's relocation, we have directed courts to conduct a similar analysis: If a parent's intent to relocate is not legitimate-i.e., the parent is primarily motivated by a desire to make visitation more difficult-then that flegitimate intent and motivation may be held against the relocating parent when determining the child's best interests. See Moeller-Prokosch v. Prokosch, 27 P.3d 314, 316 (Alaska 2001). But if the intended relocation is legitimate, the relocation itself cannot be held against the relocating parent. Moeller-Prokosch v. Prokosch, 53 P.3d 152, 155 (Alaska 2002). As we noted in Rego v. Rego, 259 P.3d 447, 454 (Alaska 2011), "we take senously the alleged mfrlngement on a custodial parent' s right to relocate

. © 15 AAC 125.020(b).

. See 175 P.3d at 44-45, 48-50.

. - Id. at 44, 49.

. Id. at 49.

. 14.

. Id. at 48-50.

. Id. at 49-50, This seems to be the incorrect standard of review. A determination that underemployment is reasonable is a factual finding, and our use of the term "finding" should have directed us to the proper "clearly erroneous" standard of review. See, eg., Reilly v. Northrop, 314 P.3d 1206, 1216 (Alaska 2013) ("[The factual findings made by the superior court that [the father] was voluntarily and unreasonably underemployed are supported by the record and are not clearly erroneous.").

. Richardson, 175 P.3d at 49-50.

. 305 P.3d 302, 303 (Alaska 2013).

. Id. at 303-05.

, Id. at 303-04.

; Id.

. Id. at 305.

, Id. >

. Id.

. Id. at 306-08; see also Richardson v. Kohlin, 175 P.3d 43, 48 (Alaska 2008) ("Sufficient factual findings are required for imputing income or declining to impute income.").

. Petrilla, 305 P.3d at 307 (footnoteg omitted).

. Id. at 308.

. Id. at 308 & n. 21.

. See Alaska R. Cw P 90.3(R)(1) (allowmg modification of child support "upon a showing of a material change of circumstances" and setting presumption of such a change if new financial situation would lead to a variation in support of more than 15%); Alaska R, Civ. P. 90.3(c)(3) (setting general minimum monthly child support).

. See ch. 1, § 1(a)(3), SSSLA 1992 (finding that. customary and traditional uses of fish and game "are culturally, socially, spiritually, and nutritionally important and provide a sense of identity for many subsistence users"").

. See, eg., Hammond v. N. Slope Borough, 645 P.2d 750, 754 (Alaska 1982) (''The significance of subsistence activities is not limited to food gathering, but involves social and cultural identification of a traditional and unique lifestyle."); State v. Tanana Valley Sportsmen's Ass'n, 583 P.2d 854, 859 n. 18 (Alaska 1978) (discussing importance of subsistence hunting to Alaska Natives and noting that "subsistence hunting is at the core of the cultural tradition of many of these people"),

. Article I, section 4 of the Alaska Constitution protects an individual's right to practice a religion. It provides: "No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof," We have adopted a three-part test that Alaska Free Exercise Clause claims must pass when seeking an exemption to a facially neutral state law: "(1) a religion is involved, (2) the conduct in question is religiously based, and (3) the claimant is sincere in' his/ her' religious belief" Swanner v. Anchorage Equal Rights Comm'n, 874 P.2d 274, 281 (Alaska 1994) (citing Frank v. State, 604 P.2d 1068, 1071 (Alaska 1979)). If these elements are established, "religiously impelled actions can be forbidden only where they pose some substantial threat to public safety, peace or order, or where there are competing governmental interests that are of the highest order and are not otherwise served." Frank, 604 P.2d at 1070, 1073-74 (alterations omitted) (citation omitted) (internal quotation marks omitted); see also Swanner, 874 P.2d at 281,

. 604 P.2d at 1069-70.

, 347 P.3d 128, 129, 131 (Alaska App.2015).

. See id. at 131, 135.

, Alaska R. Civ. P. 90.3(a)(4); 15 AAC 125,.020(b) (requiring CSSD to impute income based on a "parent's past income, skills, work history, and education, and the job opportunities in the area where the parent physically resides" (emphasis added)); see also Reilly v. Northrop, 314 P.3d 1206, 1210-12, 1217-18 (Alaska 2013) (affirming trial court order imputing income to obligor parent based on information from U.S. Department of Labor for region where parent had relocated); Petrilla v. Petrilla, 305 P.3d 302, 306-08 (Alaska 2013) (reversing because of lack of information about job opportunities where parent had relocated); O'Connell v. Christenson, 73 P.3d 1037, 1041 (Alaska 2003) (remanding for specific factual findings supporting amount of *82 imputed income, suggesting that trial court refer to Alaska Department of Labor statistics),

. Cf. American Psveratric Ass'n, Dracnostic « Sta-Tisticat Manuvat or Mentat Disorpers, Fourth Enr mow, Texr Revision (DSM-IV-TR) 212 (4th ed.2000) (listing alcohol-related disorders including alcohol dependence and abuse). .

. See Richardson v. Kohlin, 175 P.3d 43, 49-50 (Alaska 2008) (affirming finding that move to be closer to other family members and decrease parental conflict over child custody was legitimate); cf. Petrilla, 305 P.3d at 303, 305 (affirming without questioning legitimacy of father's move to be closer to terminally ill parent).

. Richardson, 175 P.3d at 49-50.

. 744 P.2d 658, 662 (Alaska 1987), overruled on other grounds by Nass v. Seaton, 904 P.2d 412, 416 (Alaska 1995). The totality of the circumstances test now is set out in the commentary to Rule 90.3:
The court may calculate child support based on a determination of the potential income of a *83 parent who voluntarily and unreasonably is unemployed or underemployed. A determination of potential income may not be made for a parent who is physically or mentally incapacitated, or who is caring for a child under two years of age to whom the parents owe a joint legal responsibility. Potential income will be based upon the parent's work history, qualifications and job opportunities. The court shall consider the totality of the circumstances in deciding whether to impute income. When a parent makes a career change, this consideration should include the extent to which the children will ultimately benefit from the change. The court also may impute potential income for non-income or low income producing assets.
Alaska R. Civ. P. 90.3 emt, HLC.

. Pattee, 744 P.2d at 662, Child support initially was set at $1,200 monthly, reduced by stipulation to $700 monthly, and further reduced to $326 monthly after trial. Id. at 659, 662 n. 7.

. Id. at 659-62.

, Id. at 662.

. Id. (quoting In re Marriage of Rome v. Rome, 190 Mont. 495, 621 P.2d 1090, 1092 (1981)) (internal quotation marks omitted).

. Opinion at 70 (emphasis added).

. 744 P.2d at 662.

. Id. at 659-62.

. 811 P.2d 1062, 1064, 1066 (Alaska 1991).

. Id. at 1064-65.

. Id. at 1066.

. 42 P.3d 1102, 1103-04 (Alaska 2002).

, Id. at 1105.

. Id. at 1106.

. 186 P.3d 546 (Alaska 2008).

, Id. at 547.

. Id. at 550-51.

. Id. at 548, 551.

. Cf. Petrillia v. Petrilla, 305 P.3d 302, 307-08 (Alaska 2013) (focusing on employment availability in new location when considering income imputation); Richardson v. Kohlin, 175 P.3d 43, 49-50 (Alaska-2008) (affirming support modification based on lower income in new location).

, Cf. Rego v. Rego, 259 P.3d 447, 454 (Alaska 2011) (stating, in custody modification context ' when custodial parent intended to relocate, that "we take seriously the alleged infringement on a custodial parent's right to relocate").

. McDonald v. Trihub, 173 P.3d 416, 427 (Alaska 2007) (quoting Adrian v. Adrian, 838 P.2d 808, 811 (Alaska 1992)) (internal quotation marks omitted).

. Ward v. Urling, 167 P.3d 48, 56 (Alaska 2007) (citing Beaudoin v. Beaudoin, 24 P.3d 523, 530 (Alaska 2001)).

. See supra note 9.

. Cf. Rego, 259 P.3d at 454.

. See Petrilla, 305 P.3d at 307-08 & n. 21 (noting lack of evidence that "higher-paying jobs were available to [the father] in Nevada" when remanding); O'Connell v. Christenson, 75 P.3d 1037, 1041 (Alaska 2003) (remanding for further findings because "it is not clear that employment opportunities exist in Anchorage," where the father lived, that would pay the amount of income imputed to him).

, See supra note 3 and accompanying text.

. 356 P.3d 280, 284 (Alaska 2015) (remanding and directing superior court to make findings based on all Rule 90.3(a)(4) factors). -

. 305 P.3d at 308 (remanding for further findings about employment opportunities available to parent in Nevada); see also Richardson v. Kohlin, 175 P.3d 43, 48 (Alaska 2008) ("Sufficient factual findings are required for imputing ... or declining to impute income.").

. See O'Connell, 75 P.3d at 1039-41; see also Simone H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 320 P.3d 284, 287 (Alaska 2014) ("When applying a multi-factor test, [tlhe superior court abuses its discretion if it considers improper factors .:., fails to consider statutorily mandated factors, or assigns disproportionate weight to some factors while ignoring others." " (alterations in original) (quoting Iverson v. Griffith, 180 P.3d 943, 945 (Alaska 2008))); cf. Olmstead v. Ziegler, 42 P.3d 1102, 1106 (Alaska 2002) (observing that trial court had "ample evidence of [the parent's] work history, qualifications, and job opportunities" when imputing income).

. In two cases outside, of Alaska where the obligor parents belonged to religious sects that held property communally, the courts recognized that the parents' religious beliefs should be considered, even though the parents still had an obligation to support their children. See In re Marriage of Murphy, 574 N.W.2d 77, 79, 81-82 (Minn. App.1998); Hunt v. Hunt, 162 Vt. 423, 648 A.2d 843, 846, 851 (1994). Unlike parents ~ who have argued that any imposition of a child support order would interfere with their religious beliefs, see, eg., Hunt, 648 A.2d at $49 {noting that obligor parent objected to payment . of any support), Jolene merely asked the court to consider her religious beliefs in assessing her situation; she agreed that she had a support obligation, requesting that the court impose the minimum $50 monthly payment.

. CL 15 AAC 125.550(a) (b)(5) (permitting CSSD to modify withholding order when obligor parent "lives a subsistence lifestyle without any local opportunity for employment").

. Cf 15 AAC 125.020(b) (requiring CSSD to consider job opportunities "in the area where the parent physically resides"), |